**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **RICARDO A. DE LOS SANTOS MORA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. No. 06-46 JFF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF DOVER POLICE** | ) | |
| **DEPARTMENT, ATTORNEY** | ) | |
| **GENERAL MARY JANE BRADY, and** | ) | |
| **DOVER CHIEF OF POLICE JEFFREY** | ) | |
| **HOBARTH (Horvath),** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS', CITY OF DOVER POLICE DEPARTMENT AND DOVER CHIEF OF POLICE JEFFREY HORVATH, MOTION TO DISMISS IN LIEU OF AN ANSWER

Defendants, City of Dover Police Department and Dover Chief of Police Jeffrey Horvath, by and through their counsel, Marshall, Dennehey, Warner, Coleman and Goggin, and pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully move this Honorable Court to dismiss Plaintiff's Complaint. In support of this motion, Defendants respectfully refer this Honorable Court to the accompanying memorandum of law. A proposed Order consistent with this motion is attached hereto.

**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**

*/s/ Daniel A. Griffith*          DE ID No. 4209

DANIEL A. GRIFFITH, ESQ. (Del. Bar ID No. 4209)
JOHN A. MACCONI, JR., ESQ. (Del. Bar ID No. 4430)
1220 North Market St., 5th Floor
P.O. Box 130
Wilmington, DE 19899-0130
*Counsel for Defendants City of Dover Police
Department and Dover Chief of Police Jeffrey
Horvath*

DATED: September 20, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **RICARDO A. DE LOS SANTOS MORA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. No. 06-46 JFF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF DOVER POLICE** | ) | |
| **DEPARTMENT, ATTORNEY** | ) | |
| **GENERAL MARY JANE BRADY, and** | ) | |
| **DOVER CHIEF OF POLICE JEFFREY** | ) | |
| **HOBARTH (Horvath),** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

IT IS HEREBY ORDERED, this _____ day of _____, 2006, upon

consideration of Defendants', City of Dover Police Department and Dover Chief of Police

Jeffrey Horvath, motion to dismiss in lieu of an Answer, and all responses thereto, that

Defendants' motion is ***GRANTED*** and Plaintiff's Complaint is ***DISMISSED*** with prejudice.

_____
J.

# CRIME REPORT

| 1 V☐ D☐ | 2 NO. VICT'S | 3 REPORT DATE | 4 DEPARTMENT | 5 PAGE | 6 COMPLAINT NO. |
|---|---|---|---|---|---|
| S☐ RP☐ | N/A | 05/04/95 | HARRINGTON POLICE DEPARTMENT | 1 OF 8 | 55-95-0977 |

| 7 NAME (LAST, FIRST, MIDDLE) | | 8 RACE,SEX,EO,AGE | 9 DOA | 10 RESID PHONE | 11 BUS PHONE |
|---|---|---|---|---|---|
| ALDEMAR, RICARDO | | B,M,H,20 | 01/24/75 | NONE | UNK |

| 12 ADDRESS | 13 RESIDENT | 14 EMPLOYER/SCHOOL |
|---|---|---|
| 735E 179 ST. APT. 51, BRONX, NY. 10457 | ☐RX ☒NON ☐NON | SEBASTIAN GROCERY - BRONX, NY. |

| 15 LOCATION OF INCIDENT | 16 GRID | 17 SECT | 18 CITY | 19 NO AREA | 20 TYPE PREMISE | 21 CODE |
|---|---|---|---|---|---|---|
| U.S.13 SOUTHBOUND HWY, HARRINGTON, DE. 19952 | 100/160 | 66 | | | HIGHWAY | 12 |

| 22 REPORTED DAY DATE TIME | 23 OCCURRED DAY DATE TIME | TO DAY DATE TIME | 24 INVOLVEMENT ALCOHOL DRUGS COMPUTER |
|---|---|---|---|
| FRI 042895 0200 HRS. | FRI 042895 0200 HRS. | FRI 042895 0215 HRS. | |

| 25 CRIME OR INCIDENT TITLE & SECTION |
|---|
| TRAFFICKING IN COCAINE T-16 SECT.4753(A)(A)(2)(A)(B)(F) |

| 26 UCR CLASS | 27 SUP CODE | 28 CRIM ACTIVITY |
|---|---|---|
| 3553722 | | P.T.D |

| 29 4-F-14 SENT DATE | 30 GA | 31 POINT OF ENTRY | 32 NATURE OF INJURIES | 33 WEAPONS MEANS/ATTACK |
|---|---|---|---|---|
| ☐YES ☐NO | | N/A | N/A | N/A |

INDICATE RELATIONSHIP TO INVESTIGATION: W-1, W-2 WITNESS...

| CODE | 34 NAME (L,F,M) | ADDRESS | PHONE |
|---|---|---|---|
| W-1 | TROOPER CAMACHO, GEORGE | DELAWARE STATE POLICE - TROOP III | 739-4865 |
| W-2 | CPL. HELSEL, TERRY ( H.P.D.) | PO BOX 236, HARRINGTON, DE. 19952 | 398-4495 |
| W-3 | LT. WILLEY ( GREENWOOD POLICE DEPARTMENT ) | GREENWOOD POLICE DEPARTMENT, GREENWOOD, DE. | 349-4822 |

| 35 EVD TES NO | PERFORMED BY | TYPE |
|---|---|---|
| | PFC.DAVIS | VIDEO TAPE AT SCENE / STATEMENTS FROM DEFENDANTS |

| 36 METHOD OF OPERATION | M.O. CLASS |
|---|---|
| DEFENDANTS DID HAVE IN THEIR POSSESSION 28.2 GRAMS OF COCAINE HIDDEN UNDER CENTER CONSOLE OF MOTOR VEHICLE. | |

| 37-1 ☐ SUSPECT ☒ DEFENDANT (L,F,M) | 37-2 TYPE ARREST | 37-3 VIO | 37-4 RACE,SEX,EO,AGE | 37-5 DOA | 37-6 RESIDENT |
|---|---|---|---|---|---|
| ALDEMAR, RICARDO | ☒ON VIEW ☐SUMMONS/WARRANT | II | B,M,H,20 | 01/24/75 | |

| 37-7 ADDRESS | 27-8 DESCRIPTION | 37-9 ARMED WITH |
|---|---|---|
| 735 E. 179 ST. APT. 51, BRONX, NY. 10457 | 5'08" 135 LBS. BLACK HAIR / BROWN EYES | U |

| 38-1 ☐ SUSPECT ☒ DEFENDANT | 38-2 TYPE ARREST | 38-3 VIO | 38-4 RACE,SEX,EO,AGE | 38-5 DOA | 38-6 RESIDENT |
|---|---|---|---|---|---|
| DE LOS SANTOS MORA, RICARDO, A. | ☒ON VIEW ☐SUMMONS/WARRANT | II | B,M,H,28 | 04/03/67 | |

| 38-7 ADDRESS | 38-8 DESCRIPTION | 38-9 ARMED WITH |
|---|---|---|
| 986 E. LUCAS CREEK ROAD, NEWPORT NEWS, VA.23602 | 5'07" 160 LBS. BLACK HAIR / BROWN EYES | U |

| 39 SUSP VEH REG # STATE | YEAR MAKE MODEL BODY COLOR(S) | IDENTIFYING CHARACTERISTICS |
|---|---|---|
| IRM5607 / VIRGINIA | 1985 MAZDA 4-DOOR SILVER | |

| CODE | PROPERTY TYPE STOLEN - S, DAMAGED - D, RECOVERED - R, SEIZED - T | | TYPE | ID NUMBER | VALUE |
|---|---|---|---|---|---|
| 00 | 40-1 | 1985 MAZDA 4 DR. SILVER VA:IRM5607 | T | JM1BC2211F1746224 | $2,000. |
| | 40-2 | 28.2 GMS. OF WHITE CHUNKY POWDERY SUBSTANCE ( COCAINE ) | T | N/A | N/A |
| | 40-3 | FICTICIOUS IDENTIFICATION ( ALEI,RICARDO ) | T | N/A | N/A |
| | 40-4 | TITLE KEYS AND REGISTRATION TO MOTOR VEHICLE | T | SEE BLOCK #39 | N/A |
| | 40-5 | | | | |

| 41 DRUG TYPE | 42 DRUG QUANTITY | 43 DRUG MEASURE | 44 DATE RECOVER'D | 45 VALUE DAMG | 46 VALUE REC | 47 VALUE STOLEN |
|---|---|---|---|---|---|---|
| T-10 | 28.2 | GM | N/A | N/A | N/A | N/A |

| CODE | 48 CONTINUATION OF ABOVE ITEMS | | |
|---|---|---|---|
| | DEFENDANT: ALDEMAR,RICARDO | | |
| 25 | POSSESSION WITH INTENT TO DELIVER T-16 SECT. 4751 (A)(B)(F) | 26) 3553-23 | P.I.D |
| 25 | MAINTAINING A VEHICLE T-16 SECT. 4755 (A)(5)(F)(F) | 26) 3593-24 | O.P |
| 25 | CONSPIRACY SECOND DEGREE T-11 SECT. 512(1)(G)(F) | 26) 3553 | 25 |
| 25 | POSSESSION OF DRUG PARAPHERNALIA T-16 SECT. 4771 (A)(M) | 26) 3595 | 26 |
| 25 | CRIMINAL IMPERSONATION T-11 SECT. 907 (1)(A)(M) | 26) 2055 | 46 |
| | ***** SEE CONTINUATION SHEET FOR CHARGE INFORMATION AND COMPLETE NARRATIVE **** | | |

| 135 DOMESTIC RELATED |
|---|
| ☐YES ☒NO |

| 134 DOES VICT REQUEST NOTICE OF FUTURE PROCEEDINGS UPON ARREST ☐YES ☐NO | 133 SUSPECTED BIAS/HATE INCIDENT ☐YES ☐NO | 49 DET NOTIFIED | 50 REFERRED TO | 51 SUPERVISOR APPROVAL VWD |
|---|---|---|---|---|

| 52 REPORTING OFFICER | HQ. | DIV. | 53 STATUS | 54 EXCEPTIONAL CLEAR |
|---|---|---|---|---|
| PFC. DAVIS | 9077 - U | | ☐UNFOUNDED ☐PENDING - ACTIVE ☒ARREST - ADULT | ☐ARREST - JUV. ☐PEND - INACTIVE ☐SERVICE CLEAR | ☐DEATH SUSPECT ☐PROSECUTION DECLINED ☐EXTRADITION DECLINED | ☐NO V COOPERATION ☐JUV NO CUSTODY ☐ADMIN SANCTION |

| 55 REPORTING PERSON'S SIGNATURE |
|---|

| 56 SOLVABILITY FACTORS |
|---|
| ☐SUSP. NAMED ☐WIT ☐M.O. ☐EVIDENCE ☐TRAC. STOLEN ☐SUSP VEH IDED | ☐SUSP LOCATED ☐SUSP DESCRIBED ☐SUSP IDED |

DUC # 45-06-72/06/06    OFFICE FOLLOW-UP ☐    DSP 4014 (10/93)

RECORDS

HARRINGTON POLICE DEPARTMENT
CONTINUATION SHEET:     PAGE     COMPLAINT#     INVESTIGATING OFFICER
                       2 OF 8   55-95-0977      PFC. DAVIS  9077 - U

DEFENDANT: DE LOS SANTOS MORA, RICARDO, A.
------------------------------------------------
25) TRAFFICKING IN COCAINE T-16 SECT.4753(A)(A)(2)(A)(B)(F)    26) 355 3
25) POSSESSION WITH INTENT TO DELIVER T-16 SECT.4751(A)(B)(F)  26) 3556-78
25) MAINTAINING A VEHICLE T-16 SECT.4755(A)(5)(F)(F)           26)3593-29
25) CONSPIRACY SECOND DEGREE T-11 SECT.512 (1)(G)(F)           26)3553c-30
25) POSSESSION OF DRUG PARAPHERNALIA T-16 SECT. 4771(A)(M)     26)3598-31
***********************************************************************

INTERVIEW VICTIM:     N/A
------------------

INTERVIEW DEFENDANT:
--------------------
    * DEFENDANT ALDEMAR:  ON 04/28/95 AT APPROX. 0205 HRS. I
CONDUCTED A ROADSIDE INTERVIEW WITH DEF.ALDEMAR BEHIND MY PATROL
VEHICLE WHILE I WAS CONDUCTING A PAT DOWN SEARCH OF HIS PERSON.
DEF.ALDEMAR STATED THAT HE WAS COMING FROM THE BRONX, NY. GOING
TO NEWPORT NEWS VA. HE FURTHER STATED THAT HE DID NOT REALLY KNOW
THE PASSENGER. I ASKED DEF.ALDEMAR IF HE HAD ANY DRUGS IN THE
VEHICLE OR ANY WEAPONS. HE STATED, "NO". I ASKED DEF.ALDEMAR IF
HE HAD ANY OBJECTION TO ME LOOKING IN THE VEHICLE FOR ANY
CONTRABAND. HE STATED, " NO." I ADVISED DEF.ALDEMAR THAT HE DID
NOT HAVE TO LET ME LOOK. HE STATED, " NO ITS ALRIGHT."
    I RETURNED TO MY VEHICLE AND DEF.ALDEMAR STOOD OUTSIDE MY
PATROL VEHICLE ON THE PASSENGERS SIDE. AGAIN I ASKED DEF.ALDEMAR
WHERE THE TWO WERE COMING FROM AND WHERE THEY WERE GOING TO.
DEF.ALDEMAR STATED THEY WERE COMING FROM THE BRONX GOING TO
VIRGINIA BEACH. I TOLD ALDEMAR THAT I THOUGHT HE TOLD ME THEY
WERE GOING TO NEWPORT NEWS. DEF.ALDEMAR THEN ADVISED THAT WAS
CORRECT. DEF.ALDEMAR STATED THAT HIS NAME WAS RICARDO, ALEX
DOB:01/24/74.
    AFTER THE COCAINE WAS FOUND AND MIRANDA WAS GIVEN
DEF.ALDEMAR STATED THAT HE KNEW NOTHING OF THE COCAINE THAT WAS
FOUND. DEF.ALDEMAR THEN STATED THAT HE DID NOT SPEAK ENGLISH THAT
WELL AND AT THAT TIME I ADVISED HIM TO MAKE NO FURTHER
STATEMENTS.
    WITNESS #1 INTERVIEWED DEF.ALDEMAR AT THE HARRINGTON POLICE
DEPARTMENT LATER THAT MORNING. WITNESS #1, FLUENT IN SPANISH,
MIRANDIZED DEF.ALDEMAR. DEF.ALDEMAR ACKNOWLEDGED HE UNDERSTOOD
HIS RIGHTS. ALDEMAR MAINTAINED THAT HE HAD NO KNOWLEDGE OF THE
COCAINE THAT WAS FOUND. DEF.ALDEMAR DID CONFESS TO WITNESS #1
THAT HE HAD GIVEN ME A FALSE NAME. DEF.ALDEMAR FINALLY GAVE
WITNESS #1 THE NAME OF RICARDO ALDEMAR DOB: 01/24/75.
    * DEFENDANT DE LOS SANTOS MORA: ON 04/28/95 AT APPROX. 0210
HRS. I SPOKE TO DEF.DE LOS SANTOS MORA WHO WAS SEATED IN THE
FRONT PASSENGERS SEAT OF THE VEHICLE. I ASKED HIM WHERE THEY WERE
COMING FROM AND WHERE THEY WERE GOING TO. DEF.DE LOS SANTOS MORA

HARRINGTON POLICE DEPARTMENT
CONTINUATION SHEET:    PAGE    COMPLAINT#    INVESTIGATING OFFICER
                       3 OF 8  55-95-0977    PFC. DAVIS  9077 - U

STATED THAT THEY WERE COMING FROM THE BRONX, NY. GOING TO
NEWPORT NEWS,VA. I ASKED HIM IF THERE WERE ANY DRUGS OR WEAPONS
IN THE VEHICLE. HE STATED, " NO, WE DONT HAVE ANYTHING LIKE
THAT." I ASKED HIM IF HE OBJECTED TO ME TAKING A LOOK FOR ANY
CONTRABAND. I FURTHER ADVISED HIM THAT HE DID NOT HAVE TO LET ME
LOOK. AS DEF.DE LOS SANTOS MORA WAS EXITING HIS VEHICLE HE
STATED, "GO AHEAD AND LOOK WE DONT HAVE ANY DRUGS."
    ONCE THE COCAINE WAS FOUND THE DEF. WAS MIRANDIZED AND
ACKNOWLEDGED HE UNDERSTOOD HIS RIGHTS. DEF.DE LOS SANTOS MORA
MAINTAINED THAT HE KNEW NOTHING OF THE COCAINE.


INTERVIEW WITNESS:
-------------------

    * W-1 ( TROOPER CAMACHO,GEORGE ) OBTAINED TRUE IDENTITY
FROM DEF.ALDEMAR.
    * W-2 ( CPL.HELSEL, TERRY ) FIELD TESTED SUBSTANCE AND
FOUND SAME TO BE POSITIVE FOR COCAINE BASE. W-2 WEIGHED COCAINE
AND RESULTS WERE 28.2 GRAMS.



INVESTIGATIVE ACTION:
---------------------

    ON 04/28/95 I WAS STATIONARY U.S.13 SOUTHBOUND HWY. AND
ARBYS RESTAURANT. I OBSERVED A VEHICLE APPROACHING AT WHAT
APPEARED TO BE A SPEED GREATER THAN THAT OF THE POSTED 35 MPH.
SPEED ZONE. I ACTIVATED MY RADAR UNIT AND OBTAINED A CLOCKING OF
56 MPH. IN THAT 35 MPH. SPEED ZONE. I IMMEDIATELY ACTIVATED MY
EMERGENCY LIGHTS AND PULLED ONTO THE HIGHWAY PURSUING THE
VEHICLE. THE VEHICLE PULLED TO THE LEFT TURN LANE AS HE
APPROACHED AND STOPPED AT THE INTERSECTION OF U.S.13 S/B AND
RTE.14. THE LIGHT WAS GREEN SO I UTILIZED MY PA SYSTEM AND
INSTRUCTED THE OPERATOR TO PULL THROUGH THE INTERSECTION AND STOP
HIS VEHICLE. THIS INSTRUCTION WAS GIVEN SEVERAL TIMES WITH NO
COMPLIANCE FROM THE OPERATOR.
    THE INTERSECTION LIGHT TURNED RED AND I EXITED MY PATROL
VEHICLE AND APPROACHED THE DRIVERS SIDE OF THE VEHICLE. THE
VEHICLE WAS TURNED OFF AND THE WINDOW WAS ROLLED UP. THE OPERATOR
( DEF.ALDEMAR ) WOULD NOT LOOK AT ME. IN LIGHT OF THIS I TAPPED
ON THE WINDOW, NO RESPONSE. I THEN BOISTROUSLY INSTRUCTED THE
OPERATOR ONCE THE LIGHT TURNED GREEN TO PULL THROUGH THE
INTERSECTION AND STOP HIS VEHICLE. THE LIGHT TURNED GREEN AND HE
EXECUTED A LEFT TURN AND STOPPED HIS VEHICLE ON RTE.14 IN FRONT
OF THE HARDEES RESTAURANT.

HARRINGTON POLICE DEPARTMENT
CONTINUATION SHEET:   PAGE      COMPLAINT#      INVESTIGATING OFFICER
                      4 OF 8    55-95-0977      PFC. DAVIS   9077 - U

    I EXITED MY PATROL VEHICLE, APPROACHED THE DRIVERS SIDE OF
THE VEHICLE AND REQUESTED FROM DEF.ALDEMAR HIS DRIVERS LICENSE
AND REGISTRATION. THE PASSENGER, DEF.DE LOS SANTON MORA, WAS
ATTEMPTING TO LOCATE HIS REGISTRATION. HE WAS HAVING TROUBLE
FINDING THE REGISTRATION SO I INSTRUCTED THE OPERATOR,
DEF.ALDEMAR TO GO AHEAD AND GIVE ME HIS LICENSE. HE TURNED TO ME
AND STATED THAT HE DID NOT HAVE THEM. I ASKED HIM IF HE EVEN HAD
A LICENSE. HE STATED THAT HE DID NOT. AT THAT TIME THE PASSENGER
STATED THAT HE HAD A LICENSE AND HANDED SAME TO ME.
    I REQUESTED THAT THE OPERATOR STEP FROM HIS VEHICLE SO I
COULD CONDUCT A ROADSIDE INTERVIEW AND POSSIBLY OBTAIN A TRUE
IDENTITY FROM THE OPERATOR. DEF.ALDEMAR COMPLIED. I TOOK DEF.
ALDEMAR BEHIND MY PATROL VEHICLE, SPOKE BRIEFLY TO HIM EXPLAINING
WHY I HAD STOPPED HIM AND CONDUCTED A PAT DOWN SEARCH OF HIS
PERSON FOR OFFICER SAFETY. DURING THE COARSE OF CONVERSATION I
ASKED DEF.ALDEMAR IF HE HAD ANY IDENTIFICATION ON HIM AND HE
PRODUCED A IDENTIFICATION CARD. I THOUGHT THE IDENTIFICATION CARD
TO BE SUSPICIOUS DUE TO THE FACT THAT NO IDENTIFIABLE STATE ISSUE
WAS DEPICTED ON THE CARD. DEF.ALDEMAR STATED THAT THE TWO WERE
COMING FROM THE BRONX, NY. GOING TO NEWPORT NEWS, VA. I ASKED
DEF. ALDEMAR IF HE HAD ANY CONTRABAND IN THE VEHICLE AND FURTHER
ASKED HIM IF HE OBJECTED TO ME LOOKING FOR ANY CONTRABAND. HE
ADVISED ME THAT THERE WAS NO CONTRABAND AND HE DID NOT OBJECT TO
ME LOOKING IN THE VEHICLE.DEFENDANT ALDEMAR HAD CONVEYED TO ME
THAT HE DID NOT REALLY KNOW THE PASSENGER, ONLY KNEW HIM BY THE
NAME OF RICARDO.
    I RETURNED TO MY PATROL VEHICLE AND RAN COMPUTER CHECKS ON
BOTH DEFENDANTS WHICH REVEALED NEITHER DEFENDANT WAS WANTED.
DEF.ALDEMAR STOOD OUTSIDE MY PATROL VEHICLE AS I CONTINUED
CARRYING ON A CONVERSATION WITH HIM. I LOOKED AT THE
IDENTIFICATION CARD AND QUESTIONED ALDEMAR ABOUT IT. I ASKED HIM
IF HIS FIRST NAME WAS RICARDO OR ALEX. HE STATED THAT HIS LAST
NAME WAS RICARDO AND FIRST NAME WAS ALEX DOB:01/24/74. I FOUND
THIS TO BE ODD BECAUSE OF THE WAY HE HAD SIGNED THE
IDENTIFICATION CARD. DEF.ALDEMAR SIGNED THE BOTTOM OF THE
IDENTIFICATION CARD, RICARDO ALEX.  I HAD AGAIN ASKED ALDEMAR
WHERE THEY WERE COMING FROM AND GOING TO AND HE STATED THAT THEY
WERE COMING FROM THE BRONX, NY. GOING TO VIRGINIA BEACH. I TOLD
HIM I RECOLLECTED THAT HE HAD ADVISED ME THAT THEY WERE GOING TO
NEWPORT NEWS, VA. HE THEN ACKNOWLEDGED THAT TO BE THE CORRECT
DESTINATION.
    I EXITED MY PATROL VEHICLE AND CONTACTED THE PASSENGER OF
THE VEHICLE, DEF.DE LOS SANTOS MORA. I ASKED HIM WHERE THEY WERE
GOING AND WHERE THEY WERE GOING TO. HE STATED THEY WERE COMING
FROM THE BRONX, NY. GOING TO NEWPORT NEWS, VA. I ASKED HIM IF HE
KNEW THE DRIVER. HE STATED THAT HIS NAME WAS RICARDO ALEX. I
FURTHER ASKED HIM IF HE HAD ANY DRUGS OR WEAPONS IN THE VEHICLE.
DEF.DE LOS SANTOS MORA ADVISED THAT HE DID NOT AND THAT I COULD
GO AHEAD AND CHECK. DEF. DE LOS SANTOS MORA EXITED THE VEHICLE

HARRINGTON POLICE DEPARTMENT
CONTINUATION SHEET:    PAGE    COMPLAINT#    INVESTIGATING OFFICER
                       5 OF 8  55-95-0977   PFC. DAVIS  9077 - U


AND STOOD TO THE FRONT OF THE VEHICLE. DEF.ALDEMAR STOOD TO THE
FRONT RIGHT OF MY PATROL VEHICLE. I STARTED MY CHECK ON THE FRONT
PASSENGERS SIDE OF THE VEHICLE. I THEN MOVED TO THE FRONT DRIVERS
SIDE. AS I OPENED THE DOOR MY ATTENTION WAS DRAWN TO A MISSING
PLASTIC RIVET THAT HOLDS THE CARPET TO THE BASE OF THE CENTER
CONSOLE. I PULLED THE CARPET SLIGHTLY BACK, LIFTED UP SLIGHTLY ON
THE PLASTIC CONSOLE AND OBSERVED A CLEAR PLASTIC BAG CONTAINING
WHITE CHUNKY POWDERY SUBSTANCE. I IMMEDIATELY SUSPECTED COCAINE
AND QUICKLY CAME OUT OF THE VEHICLE SO I COULD HAVE BOTH
DEFENDANTS IN VIEW. I THOUGHT FOR A BRIEF MOMENT THAT THE
SUBSTANCE COULD POSSSIBLY BE SOME SORT OF AIR FRESHENER. RE-
THINKING THE SITUATION IT WOULD BE ODD TO PLACE AIR FRESHENER IN
THAT LOCATION AND FOR IT TO BE IN A PLASTIC BAG. AT THAT TIME I
TOOK BOTH DEFENDANTS INTO CUSTODY. AT APPROX. 0217 HRS. I
MIRANDIZED BOTH DEFENDANTS AND THEY ACKNOWLEDGED THAT THEY
UNDERSTOOD THEIR RIGHTS.
     LT. WILLEY FROM THE GREENWOOD POLICE DEPARTMENT ARRIVED.
LT.WILLEY ASSISTED WITH THE TRANSPORT OF DEFENDANTS AND BRIEF
SEARCH OF THE VEHICLE. THE VEHICLE WAS TOWED TO THE HARRINGTON
POLICE DEPARTMENT WHERE IT WAS FURTHER PROCESSED. THE SUBSTANCE
WAS TESTED BY WITNESS #2 AND THE RESULTS WERE POSITIVE FOR
COCAINE BASE. WITNESS #2 ALSO WEIGHED COCAINE AND THE RESULTS
WERE 28.2 GRAMS.
     WITNESS #1 ARRIVED LATER THAT MORNING AND SPOKE TO BOTH
DEFENDANTS. THEY WERE MIRANDIZED BY HIM AND ACKNOWLEDGED THEY
UNDERSTOOD THEIR RIGHTS. DEF.ALDEMAR CONFESSED TO WITNESS #1 THAT
HE HAD GAVE ME A FALSE NAME AND THE IDENTIFICATION CARD WAS
FICTICIOUS. BOTH DEFENDANTS MAINTAINED THEY KNEW NOTHING OF THE
COCAINE THAT WAS LOCATED IN THE VEHICLE THEY OCCUPIED.


EXAMINATION OF CRIME SCENE:      SEE INVESTIGATIVE ACTION.
------------------------------

EVIDENCE:
---------
     * 28.2 GRAMS OF WHITE CHUNKY POWDERY SUBSTANCE INSIDE CLEAR
       PLASTIC BAG.  H.P.D. EVIDENCE 04/28/95

     * 1995 MAZDA 4-DOOR / SILVER.  H.P.D. IMPOUND 04/28/95

     * FICTICIOUS IDENTIFICATION. H.P.D. EVIDENCE 04/28/95

     * VEHICLE KEYS,TITLE,REGISTRATION. H.P.D. EVIDENCE 04/28/95

     * VIDEOTAPE OF CRIME SCENE VIA DASH MOUNTED CAMERA.

HARRINGTON POLICE DEPARTMENT
CONTINUATION SHEET:    PAGE    COMPLAINT#         INVESTIGATING OFFICER
                       6 OF 8  55-95-0977          PFC. DAVIS  9077 - U

STOLEN PROPERTY:        N/A
-----------------


PROSECUTIVE ACTION:
--------------------

    DEFENDANT ALDEMAR
    -----------------
 *  TRAFFICKING IN COCAINE
 *  POSSESSION WITH INTENT TO DELIVER
 *  MAINTAINING A VEHICLE
 *  CONSPIRACY SECOND DEGREE
 *  POSSESSION OF DRUG PARAPHERNALIA
 *  CRIMINAL IMPERSONATION

    DEFENDANT DE LOS SANTOS MORA
    ----------------------------
 *  TRAFFICKING IN COCAINE
 *  POSSESSION WITH INTENT TO DELIVER
 *  MAINTAINING A VEHICLE
 *  CONSPIRACY SECOND DEGREE
 *  POSSESSION OF DRUG PARAPHERNALIA

DEFENDANTS WERE ARRAIGNED AT JP COURT 6 IN HARRINGTON BY JUDGE
MAYBEE. DEF.ALDEMAR WAS COMMITTED TO THE DELAWARE CORRECTIONAL
CENTER IN DEFAULT OF $64,500 CASH SECURED BOND. DEF. DE LOS
SANTOS MORA WAS COMMITTED TO THE DELAWARE CORRECTIONAL CENTER IN
DEFAULT OF $64,000 CASH SECURED BOND.

## ARREST REPORT

| | | |
|---|---|---|
| 1. SBI 00.329283 | 2 DATE OF ARREST 042895 | ARREST NO. 297174 |

DISSEMINATION OF THIS RECORD IS RESTRICTED TO CRIMINAL JUSTICE AGENCIES ONLY

3. DEFENDANT'S NAME (LAST, FIRST, MIDDLE SUFFIX): ALDEMAR, RICARDO
4. GRID OF RESIDENCE: UNK
17. FBI NO.
18. MO CLASS

5. DEFENDANT'S ADDRESS: 735 E. 179 ST   COMMUNITY   CITY BRONX, NY.
19. MISCELLANEOUS IDENT. NO'S.

6. ALIAS OR NICKNAME: ALEX, RICARDO
7. OCCUPATION: Grocery Boy
EMPLOYER OR SCHOOL ATTENDS: SEBASTIAN Grocery
20. RESIDENCE PHONE ☐ DAY ☐ NONE   BUSINESS PHONE UNK

8. RACE SEX EU AGE / DOB: B M H JO 01247 5'6" 135 BLK BRN MED
HEIGHT WEIGHT HAIR EYES COMPLEX
COMPLAINT NO. 55-95-0977
21. LOCATION OF ARREST (ADDRESS): U.S. 133/B HWY. Harrington

9. PLACE OF BIRTH: DOMINICAN REPUBLIC
10. SOCIAL SECURITY NO: UNK
11. DL NO: NONE
22. DESCRIBE TYPE OF PREMISE-CRIME OCCURRED HIGHWAY

12. SCARS, MARKS, TATTOOS: NONE
☒RIGHT ☐LEFT HANDED
23. VEHICLE INVOLVED 1985 MAZDA   REG NO ZN5607   STATE VA   YEAR 96

13. ARRAIGNMENT DATE 042895 COURT JP6 JUDGE MAYBEE
14. TRIAL DATE PENDING C.C.P COURT JUDGE
HOLD PLACED ON VEHICLE ☐YES ☐NO HARRINGTON P.D.   VEHICLE TOWED TO

15. ARREST DISPOSITION/DATE: SECURED $69,000 CASH
16. ARRESTING OFFICER PFC DAVIS   NO 9077   DIVISION U
24. PLACE OF CRIME-ADDRESS U.S. 133 HWY Harrington

| 25 DATE OF CRIME | COMPLAINT NO | GRID OF INCIDENT | CLASS NO | CRIME | TITLE/SECTION | FINAL DISPOSITION |
|---|---|---|---|---|---|---|
| 4 28 95 | 55-95-0977 | 100/160 | 3553 | TRAFF IN COCAINE | 16/4753(A)(X)(A)(E)(F) | |
| 4 28 95 | 55-95-0977 | 100/160 | 3556 | PWITTD NARC II | 16/4751 (N)(C)(A) | |
| 4 28 95 | 55-95-0977 | 100/160 | 3593 | MAINTAINING A VEHICLE | 16/4755(A)(5)(B)(A) | |
| 4 28 95 | 55-95-0977 | 100/160 | 3598 | POSS DRUG PARA | 16/4771 (A)(m) | |
| 4 28 95 | 55-95-0977 | 100/160 | 3553(C) | CONSPIRACY II | 11/512 (I)(C)(F) | |
| 4/28/95 | 55-95-0977 | 100/160 | 2604 | CRIM IMPERSON | 11/907 (C)(A)(m) | |

☐ MARRIED ☐ SEPARATED ☐ SINGLE ☒ DIVORCED   SPOUSE'S NAME N/A   ADDRESS   AGE   PHONE

RELATIVES FATHER, MOTHER (IF ALIVE) BROTHERS, SISTERS
M) DECEASED   205 Plummer Dr. 6458 Cody   JUN 68 1995
F) BENNICIO RICARDO   3444 WHITE PLAINS RD NY 041   NONE

27. VICTIM/COMPLAINANT N/A
28. NAME OF PARENT/GUARDIAN NEXT OF KIN NOTIFIED N/A

29. NARRATIVE PLACES FREQUENTED, FACTS OF ARREST, ASSOCIATES, MILITARY SERVICE, EDUCATION
E) 11TH GR GUFFIO HOFSERY H.S.
M) NONE

WARRANT CHECK ☒ N   30. DEFENDANT & MONEY, PROPERTY (IF SEIZED BY OFFICER) SEE REPORT
31.   PAGE 7 OF 8   32. DATE/TIME COMMITTED 4/28/95 1130   33. SUPERVISOR NO.

**ARREST REPORT**

| SBI 00329282 | 2. DATE OF ARREST 4/28/95 | ARREST NO. 297173 |
|---|---|---|

DISSEMINATION OF THIS RECORD IS RESTRICTED TO CRIMINAL JUSTICE AGENCIES ONLY

17. FBI NO.     18. MO CLASS

3. DEFENDANT'S NAME (LAST, FIRST, MIDDLE SUFFIX)
DE LOS SANTOS MORA, RICARDO, A.

4. GRID OF RESIDENCE UNK

5. DEFENDANT'S ADDRESS
886 E. LUCAS CREEK ROAD, COMMUNITY _____ CITY NEWPORT NEWS, VA 23602.

19. MISCELLANEOUS IDENT. NO &

6. ALIAS OR NICKNAME NONE | 7. OCCUPATION LABORER | EMPLOYER OR SCHOOL ATTENDS AFLEES

20. RESIDENCE PHONE 84-875-9882  ☐ DAY ☐ NIGHT | BUSINESS PHONE UNK

8. RACE SEX EO AGE DOB B,M, M 28 4 3 67 | HEIGHT 5'01" | WEIGHT 160 | HAIR BLK | EYES BRO | COMPLEX MED. | COMPLAINT NO. 55-95-0977

21. LOCATION OF ARREST (ADDRESS)
U.S. 135/B HWY HARRINGTON

9. PLACE OF BIRTH DOMINICAN REPUBLIC | 10. SOCIAL SECURITY NO. 22671 0380 | 11. D.L. NO. 226710380 - VA

22. DESCRIBE TYPE OF PREMISE/ CRIME OCCURRED
HIGHWAY

12. SCARS, MARKS TATTOOS SCAR IN MIDDLE OF CHEST.
JESUS WITH SUN ON BACKGROUND WITH THE WORDS "APA ACRI" | ☐ RIGHT ☐ LEFT HANDED

23. VEHICLE INVOLVED MAZDA | REG NO ZRN5607 | STATE VA | YEAR 96

13. ARRAIGNMENT DATE 4/28/95 | COURT J-6 | JUDGE MAYBEE | 14. TRIAL DATE COURT PENDING | JUDGE

HOLD PLACED ON VEHICLE ☐ YES ☐ NO HARRINGTON P.D. | VEHICLE TOWED TO

15. ARREST DISPOSITION/DATE
COMMITTED 64,000 ON 4/28/95

16. ARRESTING OFFICER PFC DAVIS 9077-U | DIVISION

24. PLACE OF CRIME-ADDRESS
U.S. 13 3/8 HWY HARRINGTON

| 25. DATE OF CRIME | COMPLAINT NO. | GRID OF INCIDENT | CLASS NO | CRIME | TITLE/SECTION | FINAL DISPOSITION |
|---|---|---|---|---|---|---|
| 4/28/95 | 55-95-0977 | 100/160 | 3553 | TRAFFICKING COCAINE | 14/4753 (A)(5)(A)(E)(G) | |
| 4/28/95 | 55-95-0977 | 100/160 | 3556 | POSS. WITH INTENT TO DELIVER | 14/4751 (A)(5)(A) | |
| 4/28/95 | 55-95-0977 | 100/160 | 3593 | MAINTAINING A VEHICLE | 16/4757 (A)(5)(E)(G) | |
| 4/28/95 | 55-95-0977 | 100/160 | 3598 | POSSESSION OF DRUG PARA | 16/4771 (A)(E) | |
| 4/28/95 | 55-95-0977 | 100/160 | 3558G | CONSPIRACY II | 11/512 (1)(E)(F) | |

(Left side vertical note: Hold - Melau 3-13-96)

205P Comm DCE. Def 64,000 Cash Bond

26. MARRIED ☐ SEPARATED ☐ SINGLE ☑ DIVORCED ☐ | SPOUSE'S NAME | ADDRESS | AGE | PHONE

RELATIVES FATHER, MOTHER OF ALIVE) BROTHERS, SISTERS | ADDRESS | AGE | PHONE
(F) DECEASED GLORIA DELOSSANTOSMORA 886 E LUCAS CRK RD NEWPORT NEWS VA 27

(M) MORA, MAXEMA   DOMINICAN REPUBLIC.   57   809 569-3438

(B) BRASENTO PEDRO   NEWPORT NEWS, VA.   30.   804 877-0508

27. VICTIM/COMPLAINANT
ON VIEW | ADDRESS | CITY | RES. PHONE | BUS. PHONE

28. NAME OF PARENT/GUARDIAN/NEXT OF KIN NOTIFIED
N/A | DATE/TIME | OFFICER | NO.

29. NARRATIVE: PLACES FREQUENTED, FACTS OF ARREST, ASSOCIATES, MILITARY SERVICE, EDUCATION
UNCOOPERATIVE

WOULD NOT PROVIDE.

WARRANT CHECK ☐ DELIIS ☑ NCIC ☐ | 30. DEFENDANT'S MONEY, PROPERTY (IF SEIZED BY OFFICER)
SEE CRIME REPORT. | 31. PAGE 8 OF 8 | 32. DATE/TIME COMMITTED 4/28/95 1130 | 33. SUPERVISOR | NO.

| 14 DEPARTMENT | SUPPLEMENT REPORT | 16 COMPLAINT NO. |
|---|---|---|
| HARRINGTON POLICE DEPARTMENT | | 5595000977 |

| 5 PAGE | 13 DATE-TIME THIS REPORT | 11. V _ D X I 7 NAME (Last-First-Middle) | (Business/Firm Name) |
|---|---|---|---|
| 1 OF 1 | 05/03/95 - 13:00 | S _ RP : ALDEKAR,RICARDO | |

| 123 DATE-TIME OF ORIGINAL INCIDENT | 112 ADDRESS | 144 ARREST NO. |
|---|---|---|
| 04/28/95 • 02:00 | : JOSE 173 ST, BRX,51 BRONX NY | 00000 |

| 129 4-F-14 SENT  DATE | 150P SEN. | .9) ADDITIONAL STOLEN/25 OFFENSE CHANGED FROM | 12F SUPPLEMENT CODE |
|---|---|---|---|
| YES: NU: X | YES: NO: X | 0.00 | |

| 150 FOLLOW-UP: _ | 144 RECOV. STOLEN DATE | 146 ADDITIONAL RECOV.125 CURRENT OFFENSE | 126 U.C.R. CLASS |
|---|---|---|---|
| ADD INFO: X | / / | 0.00  : TRAFFICKING COCAINE F/16 4/53 A-A-Z-A-B | 35  02 |

NARR: DO NOT REPEAT THE RESULTS OF THE PRELIMINARY INVESTIGATION. REPORT ALL ACTIONS TAKEN AND ALL DEVELOPMENTS IN THE CASE SINCE THE LAST REPORT. DESCRIBE AND RECORD THE VALUE OF RECOV. PROP. LIST THE NAME, RECORD NUMBER AND DESC.OF PERSONS ARRESTED, EXPLAIN CODE (CLASSIFICATION CHANGE. CLEARLY SHOW THE DISPOSITION OF RECOVERED PROPERTY.

ON 050395 EVIDENCE IN THE ABOVE CASE (28.2 GM COCAINE ) WAS TURNED OVER TO THE E.SECTN (LEATTACHED OFFICE OF COURIER LOCK BOX #37.)

| 152 REPORTING OFFICER   NO.  DIV. | 153 STATUS | 154 EXCEPTIONAL CLEAR | |
|---|---|---|---|
| PFC ERIC MALONEY | _ Unfounded        _ Arrest - Juv | _ Death Suspect | _ No V Cooperation |
| | _ Pending - Active  _ Pend - Inactive | _ Prosecution Declined | _ Juv No Custody |
| 151 SUPERVISOR APPROVING | X Arrest - Adult    _ Service Clear | _ Extradition Declined | _ Admin Sanction |

| 156 SOLVABILITY FACTORS | WIT        NO.        _ EVIDENCE    TKAC. STOLEN    SUSP VEH ID'ED    157 |
|---|---|
| _ SUSP. NAMED     _ SUSP LOCATED        _ SUSP. DESCRIBED    _ SUSP. ID'ED    _ OFFICE FOLLOW-UP CLOSED |

CRIMINAL INVESTIGATION

| 4 DEPARTMENT | | SUPPLEMENT REPORT | 16 COMPLAINT NO. |
|---|---|---|---|
| HARRINGTON POLICE DEPARTMENT | | | 559500097 |

| 9 PAGE | 13 DATE-TIME THIS REPORT | 1. V  D I | 7 NAME (Last-First-Middle) | (Business/Firm Name) |
|---|---|---|---|---|
| 1 OF  1 | 07/24/95 - 13:00 | 9  RP | ALDEMAR,RICARDO | |

| 122 DATE-TIME OF ORIGINAL INCIDENT | 112 ADDRESS | 184 ARREST NO. |
|---|---|---|
| 04/28/95 - 02:00 | 735E 179 ST, APT.51 BROX, NY | 00000 |

| 129 4-F-14 SENT   DATE | SUP SENT | 147 ADDITIONAL STOLEN | 159 OFFENSE CHANGED FROM | 127 SUPPLEMENT CODE |
|---|---|---|---|---|
| YES: _  NO: X | YES: _  NO: X | 0.00 | | |

| 158 FOLLOW-UP: | 144 RECOV. STOLEN DATE | 146 ADDITIONAL RECOV. | 125 CORRECT OFFENSE | 126 U.C.R. CLASS |
|---|---|---|---|---|
| ADD INFO: X | / / | 0.00 | TRAFFICKING COCAINE 1/16 4753 A-A-2-A-DF | 135  2B |

NARR: DO NOT REPEAT THE RESULTS OF THE PRELIMINARY INVESTIGATION. REPORT ALL ACTIONS TAKEN AND ALL DEVELOPMENTS IN THE CASE SINCE THE
LAST REPORT. DESCRIBE AND RECORD THE VALUE OF REC. PROP. LIST THE NAME, RECORD NUMBER AND DESC. OF PERSONS ARRESTED, EXPLAIN
CODE (CLASSIFICATION CHANGE. CLEARLY SHOW THE DISPOSITION OF RECOVERED PROPERTY.

ON 072495 EVIDENCE IN THE ABOVE CASE WAS RETURNED FROM THE MEDICAL EXAMINERS OFFICE BY CURRIER LOCK BOX AND ENTERED INTO MAIN
EVIDENCE.

| 152 REPORTING OFFICER   NO.  DIV. | 153 STATUS | | 154 EXCEPTIONAL CLEAR | |
|---|---|---|---|---|
| PFC ERIC MALONEY | _ Unfounded | _ Arrest - Juv | _ Death Suspect | _ No V Cooperation |
| | _ Pending - Active | _ Pend - Inactive | _ Prosecution Declined | _ Juv No Custody |
| 151 SUPERVISOR APPROVING | X Arrest - Adult | _ Service Clear | _ Extradition Declined | _ Adult Sanction |

| 156 SOLVABILITY FACTORS | WIT | NO. | EVIDENCE | TRAC. STOLEN | SUSP VEH ID'ED | 157 |
|---|---|---|---|---|---|---|
| SUSP NAMED | SUSP LOCATED | | | SUSP DESCRIBED | SUSP ID'ED | OFFICE FOLLOW-UP/CLOSE |

LEXSEE 128 FED. APPX. 910

**KEVIN E. BROWN; ERICA BROWN, Appellants v. TINA DANIELS; BRANDY NEIDER; BERKS COUNTY CHILDREN AND YOUTH SERVICES**

No. 04–3664

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*128 Fed. Appx. 910; 2005 U.S. App. LEXIS 7132*

**April 4, 2005, Submitted Under Third Circuit LAR 34.1(a)
April 25, 2005, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Motion denied by *Brown v. Daniels, 2006 U.S. Dist. LEXIS 45274 (E.D. Pa., June 15, 2006)*

**PRIOR HISTORY:** On Appeal From the United States District Court For the Eastern District of Pennsylvania. (D.C. Civ. No. 03–cv–04242). District Judge: Honorable Petrese B. Tucker.

**COUNSEL:** KEVIN E. BROWN; ERICA BROWN, Appellants, Pro se, Reading, PA.

For TINA DANIELS; BRANDY NEIDER; BERKS COUNTY CHILDREN AND YOUTH SERVICES, Appellees: Paola T. Kaczynski, Holsten & Associates, Media, PA.

**JUDGES:** BEFORE: ALITO, SMITH and BECKER, CIRCUIT JUDGES.

**OPINION:** [*911] PER CURIAM

Kevin Brown and Erika Brown (collectively, "the Browns") appeal pro se from the order of the United States District Court for the Eastern District of Pennsylvania dismissing their action filed pursuant to *42 U.S.C. § 1983*. For the reasons that follow, we will affirm in part and vacate in part the District Court's judgment.

[*912] Because we write only for the parties, we will briefly summarize only those facts essential to our disposition of this appeal. On May 21, 2003, the Browns' minor child, Travonne Lydell Wilson, was re-

moved from their home by [**2] his maternal aunt, Catherine Smith. Smith then transported Travonne to Berks County Children and Youth Services ("BCCYS"), where he was interviewed and examined by BCCYS employee, Tina Daniels. At that time, Daniels, who had received a report that Travonne was being physically abused by Kevin Brown, observed multiple bruises on Travonne's upper rear thighs. According to the Browns, Daniels then contacted them at work, advised them that Travonne had been placed with his maternal grandmother pursuant to Pennsylvania state law, and that they should "stay away" from Travonne until the completion of her investigation. Approximately one week later, Daniels notified the Browns in writing of the alleged physical abuse report. It is unclear from the record what transpired until July 9, 2003, when a Juvenile Court hearing was conducted. At the July 9 hearing, the Juvenile Court directed the family to begin counseling, and ordered Travonne to "remain in residence with his grandmother under protective supervision of [BCCYS]."

On August 11, 2003, the Browns filed the underlying complaint in the District Court for the Eastern District of Pennsylvania. The Browns alleged that Daniels, Supervisor [**3] Brandy Neider and BCCYS (collectively, "the appellees") violated their substantive due process rights by examining Travonne; notifying Kevin Brown's employer of the abuse allegations; and harassing them "during the healing process." The Browns further alleged that the appellees violated their procedural due process rights by removing Travonne from their home without a court order or hearings as required by Pennsylvania law. n1 The Browns sought punitive and compensatory damages for their "mental anguish and physical suffering." The appellees filed a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. n2 On August 13, 2004, the District Court granted the motion to dismiss, determining that the Browns had failed to state a claim alleging violations of their due process rights or of the Child Protective Services Law, *23 Pa.C.S.A. § 6301*

128 Fed. Appx. 910, *912; 2005 U.S. App. LEXIS 7132, **3

*et seq.*, and that, in any event, the appellees were entitled to qualified immunity. This timely appeal followed.

n1 In their complaint, the Browns vaguely alleged that their other minor child, Trista Lynn Wilson, was "ordered to stay with" the maternal grandmother in an "unsafe environment." The Browns failed to elaborate factually or legally on this claim either in the District Court or on appeal. Such conclusory allegations are simply insufficient to state a claim. See *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)* (stating that "a court need not credit a complaint's bald assertions or legal conclusions when deciding on a motion to dismiss") (internal quotations omitted). Accordingly, the District Court properly dismissed the Browns' claims to the extent that they related to Trista.

[**4]

n2 Thereafter, the appellants filed a motion for leave to amend their complaint, seeking to add as defendants: juvenile court judge, Maryann Campbell; court-appointed expert, Thomas G. Baker, Ph.D.; and BCCYS caseworker, James Trump. On February 26, 2004, the District Court denied in part and dismissed without prejudice in part the appellants' motion to amend. The appellants neither challenge this ruling on appeal, nor have they provided any factual or legal support for claims against these putative defendants.

Our standard of review of the District Court's dismissal under *Rule 12(b)(6)* is plenary. See *Gallo v. City of Philadelphia, 161 F.3d 217, 221 (3d Cir. 1998)*. "We must determine whether, under any reasonable reading of the pleadings, the [*913] plaintiffs may be entitled to relief, and we must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*.

The Browns challenge two of the District Court's procedural rulings on appeal. First, the Browns argue that [**5] the District Court erred in considering materials outside of the pleadings when it granted the appellees' motion to dismiss. "In deciding motions to dismiss pursuant to *Rule 12(b)(6)*, courts generally consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of America, 361 F.3d 217, 222 n. 3 (3d Cir. 2004)*; see also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)* (emphasis

omitted) (explaining that a document forms the basis of a claim if it is "integral to or explicitly relied upon in the complaint"). Here, the Browns attached to their reply to the appellees' motion to dismiss a number of documents, including pleadings and orders filed in the Court of Common Pleas of Berks County. In granting the appellees' motion to dismiss, the District Court relied upon several of the Browns' documents. However, the District Court only relied upon those documents which are a matter of public record or were integral to the Browns' claims. Moreover, the District Court's consideration of the documents was not unfair to the Browns [**6] because, by themselves relying upon the documents, the Browns were on notice that they would be considered. See id. Under these circumstances, we conclude that the District Court did not improperly rely upon documents submitted by the Browns. Second, the Browns argue that the District Court improperly granted the appellees' motion to dismiss without first requiring the appellees to file an answer to their complaint. A *Rule 12(b)(6)* defense for failure to state a claim may be raised in a pre-answer motion. See *Fed. R. Civ. P. 12(b)*. "If the court denies the motion, . . . the [answer must] be served within 10 days after notice of the court's action." *Fed. R. Civ. P. 12(a)(4)(A)*. If, however, the District Court grants the motion, as it did here, the plaintiff's action is dismissed and an answer is no longer required. Accordingly, because the District Court granted the appellees' motion to dismiss, the appellees were not required to file an answer to the Browns' complaint.

Turning to the merits of the complaint, we will affirm the District Court's dismissal of the Browns' claims against Neider and [**7] the BCCYS, although for different reasons than those proposed by the District Court. See *Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000)* (en banc) (concluding that we may affirm the District Court on any grounds supported by the record). The Browns' complaint contains no allegation of Neider's involvement in the alleged constitutional violations, but rather attempts to hold her responsible merely because of her supervisory position within the BCCYS. It is well-established, however, that liability in a *§ 1983* action must be predicated upon personal involvement, not on the basis of *respondeat superior*. See *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)*. Likewise, in order to establish liability on the part of the BCCYS, the Browns would have to show that it had an established policy or custom that resulted in the alleged constitutional violations. See *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*. The Browns' complaint failed to identify any such customs or policies.

The District Court also did not err in dismissing the Browns' claims that Daniels [*914] violated their rights by [**8] examining Travonne for bruises, notifying Kevin

Brown's employer of the abuse allegations, and harassing them "during the healing process." Parents have a liberty interest in the care, custody, and management of their children. See *Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997)*. "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused." *Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999)*; see also *Croft, 103 F.3d at 1125* ("The right to familial integrity, in other words, does not include a right to remain free from child abuse allegations."). "In cases like this, where abusive action by a member of the executive branch is alleged, 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *Miller, 174 F.3d at 375* (quoting *County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)* (citation and internal quotation marks omitted)). Thus, to generate liability, the executive action alleged must be so "ill-conceived or malicious, [**9] " *Miller, 174 F.3d at 375*, that it "shocks the conscience." *Lewis, 523 U.S. at 846*.

Even if all of the facts alleged by the Browns are true, Daniels did not act in a way that shocks the conscience. The Browns do not dispute that Daniels received a report that Travonne was being physically abused by Kevin Brown, or that Travonne told Daniels that he was afraid to return home. Likewise, the Browns do not dispute that Travonne had bruising on his thighs consistent with repeatedly being hit with a belt. Under these circumstances, where Daniels had a reasonable belief that Travonne was in danger, she did not act in a way that shocks the conscience by viewing Travonne's upper thighs. Moreover, we agree with the District Court that while notifying Kevin Brown's employer about her investigation may have been "ill-advised or an exercise in poor judgment," Daniels' alleged actions do not rise to the level of a due process violation. Additionally, the Browns' conclusory allegations of harassment by Daniels "during the healing process" are insufficient to state a claim. See *Morse, 132 F.3d at 906 (3d Cir. 1997)*.

The Browns also alleged that Daniels [**10] violated their procedural due process rights when she took Travonne into custody on May 21, 2003, without: (1) obtaining a court order; (2) notifying them in writing within 24 hours of his whereabouts; and (3) conducting an informal hearing within 72 hours, all in violation of state law. See *42 Pa.C.S.A. § 6324* (providing methods for taking child into custody) and *§ 6332* (requiring an informal hearing within 72 hours of the child's placement in protective custody); *23 Pa.C.S.A. § 6315(b)* (providing that no child may be held in protective custody for more than 24 hours without a court order) and *§ 6315(c)* (providing for parental notification within 24 hours of child's

whereabouts). The Browns do not challenge the constitutionality of the Pennsylvania laws governing protective custody. However, they do claim that by failing to comply with the procedures required by state law, especially with regard to the 72 hour limit for holding a post-deprivation informal hearing, Daniels violated their procedural due process rights. See, e.g., *Miller, 174 F.3d at 372–374*; *Patterson v. Armstrong Cty. Children & Youth Services, 141 F. Supp. 2d 512, 531–540 (W.D. Pa. 2001)*. [**11]

It is well-settled that "in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or an order of the court." *Hollingsworth v. Hill, 110 F.3d 733, 739 [*915] (10th Cir. 1997)*. However, "in those extra-ordinary situations where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." *Suboh v. District Attorney's Office of Suffolk, 298 F.3d 81, 92 (1st Cir. 2002)*. Thus, "when the state removes a child from [his] parents, due process guarantees prompt and fair post-deprivation judicial review." *Berman v. Young, 291 F.3d 976, 985 (7th Cir. 2002)*; see also *Miller, 174 F.3d at 372 n. 4*; *Jordan v. Jackson, 15 F.3d 333, 343 (4th Cir. 1994)* (noting that "the requirements of due process may be delayed where emergency action is necessary to avert imminent harm to a child, provided that post-deprivation process to ratify the emergency action is promptly accorded") (internal [**12] citations omitted).

Although there is no bright-line rule for deciding whether a post-deprivation hearing is sufficiently "prompt," the delay should ordinarily be measured in hours and days, as opposed to weeks. See *Tower v. Leslie-Brown, 326 F.3d 290, 299 (1st Cir. 2003)* (approving a post-deprivation hearing that occurred three days after children were removed from parents' home where child protective worker sought ex parte review of the removal decision within hours of the removal); *Berman, 291 F.3d at 985* (concluding that a 72-day delay in the proceedings was "rather outrageous," but finding no actual damages resulting from the delay in the post-deprivation hearing); *Whisman v. Rinehart, 119 F.3d 1303, 1310 (8th Cir. 1997)* (concluding that under the facts before it, a hearing held 17 days after the state had taken custody was not "prompt"); *Jordan, 15 F.3d at 351* (concluding that a 65-hour delay in judicial review of an emergency removal was constitutionally permissible, but that the 65-hour period was "near, if not at, the outer limit of permissible delay"); *Cecere v. City of New York, 967 F.2d 826, 829–30 (2d Cir. 1992)* [**13] (approving a 4 day delay); *Lossman v. Pekarske, 707 F.2d 288, 290 (7th Cir. 1983)* (approving a post-deprivation hearing that occurred 12 days after the state took custody, but noting that the hearing would

128 Fed. Appx. 910, *915; 2005 U.S. App. LEXIS 7132, **13

have taken place earlier had the parents not requested additional time to prepare).

Assuming all of the Browns' allegations to be true, as we must, Travonne was placed in protective custody with his maternal grandmother without a court order on May 21, 2003. However, based upon the sparse record on appeal, it appears that post-deprivation proceedings may not have been conducted until July 9, 2003, approximately seven weeks after Travonne was placed with his maternal grandmother. Without commenting on the ultimate merits of the claim, we conclude that, on this record, the Browns sufficiently alleged a violation of their procedural due process rights against Daniels.

Finally, on this record we cannot conclude that Daniels is entitled to the defense of qualified immunity. Although qualified immunity is an affirmative defense, "a complaint may be subject to dismissal under *Rule 12(b)(6)* when an affirmative defense appears on its face. Thus, qualified immunity will [**14] be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." *Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001)* (quotations and citations omitted). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional laws of which a reasonable person would have known." *Harlow v. Fitzgerald,* [*916] *457 U.S. 800,*

*818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).* A right may be clearly established even if there is no "previous precedent directly in point." *Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989)* (denying qualified immunity and citing case law from other jurisdictions). "The ultimate issue is whether . . . reasonable officials in the defendants' position at the relevant time could have believed that, in light of what was in the decided case law, that their conduct would be lawful." *Id.* Accepting the allegations in the complaint as true and drawing all inferences in the Browns' favor, a reasonable [*15] BCCYS employee could not have believed that a post-deprivation hearing conducted seven weeks after the removal of a child from his parents' home complied with due process. See, e.g., *Miller, 174 F.3d at 372 n. 4* (explaining that initiating child custody proceedings by ex parte order is generally constitutional *if* a prompt post-deprivation hearing is held, and noting Pennsylvania's 72 hour requirement); see also *Patterson, 141 F. Supp. 2d at 540–42* (rejecting qualified immunity defense where defendants failed to provide plaintiffs with a prompt and adequate judicial hearing within 72 hours of taking child into protective custody).

Accordingly, we will vacate the District Court's August 13, 2004, judgment as to the Browns' procedural due process claim against Daniels. We will affirm the District Court's judgment in favor of all the appellees as to the remainder of the claims.

LEXSEE 57 FED. APPX. 4

**UNITED STATES OF AMERICA, Appellee, v. RAMON PINEDA, Defendant, Appellant.**

**No. 01–2240**

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

*57 Fed. Appx. 4; 2003 U.S. App. LEXIS 740*

**January 17, 2003, Decided**

**NOTICE:** [**1] RULES OF THE FIRST CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by *Pineda v. United States, 155 L. Ed. 2d 500, 123 S. Ct. 1643, 2003 U.S. LEXIS 2645* (U.S., Mar. 31, 2003)

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Richard G. Stearns, U.S. District Judge.

**DISPOSITION:** Affirmed.

**COUNSEL:** Mark L. Stevens, on brief, for appellant.

Theodore D. Chuang, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, were on brief, for appellee.

**JUDGES:** Before Torruella, Circuit Judge, Cyr and Stahl, Senior Circuit Judges.

**OPINION:**

[*5] **Per Curiam.** Defendant–appellant Ramon Pineda appeals the district court's acceptance of his guilty plea at his Rule 11 hearing, and the denial of his motion to suppress evidence of his prior deportation. After careful review of the briefs and record in this case, we affirm.

### I. The Facts

The district court found the pertinent facts to be as follows. Pineda, a citizen of El Salvador, immigrated to the United States in 1980. In 1989, he married an American citizen and took steps to regularize his immigration status. His residency status was revoked in 1992 because his then–estranged wife failed [**2] to attend an Immigration and Naturalization Service ("INS") marital interview. On November 5, 1993, the INS served Pineda with an Order to Show Cause. The ensuing deportation proceedings culminated on July 22, 1994, when an Immigration Judge ("IJ") found Pineda deportable and ineligible for discretionary relief under § 212(c). The IJ granted Pineda a forty–five day stay of deportation to permit him to file an asylum claim. This stay was extended twice, but Pineda never filed an asylum claim.

In September 1994, after the expiration of the initial forty–five day stay, Pineda was incarcerated on a state rape charge. On March 2, 1995, the IJ ruled that Pineda's failure to file the asylum claim constituted a waiver and abandonment. Consequently, he ordered Pineda deported and, on June 17, 1996, Pineda was deported to El Salvador.

Pineda re–entered the United States illegally in September of 1996 and was arrested on another state charge in 1997. While in state custody, Pineda was indicted for one count of unlawful reentry to the United States in violation of *8 U.S.C. § 1326.* On August 2, 2000, Pineda filed a motion to suppress evidence of his prior deportation on [**3] due process grounds. While the suppression motion was pending, the indictment was superseded by one charging illegal entry by an aggravated felon after deportation in violation of *8 U.S.C. § 1326.*

On January 9, 2001, the district court denied Pineda's motion to suppress evidence of his prior deportation. First, the [*6] district court held that although Pineda was not orally advised of his right to appeal the deportation order at the March 2, 1995 hearing, the fact that he received written notice of that right satisfied the requirements of both INS regulations and due process in this case. The district court rejected the claim that oral colloquy regarding appeal rights is mandatory, holding that such inquiry is only required when "the IJ is seeking to extract a waiver of an alien's right of appeal," which did not occur in the present case.

Second, the district court held that although Pineda

was never advised — pursuant to Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, *21 U.S.T. 77, 596 U.N.T.S. 261, 1967 WL 18349* (ratified November 24, 1969) ("Vienna Convention") — of the right of an arrested alien to contact consular [**4] officials from his native country, such a failure does not constitute grounds for suppression because "there is no general exclusionary rule for international law violations," and because the Vienna Convention provides no specific judicial remedy for a violation and confers no private right of action for redress of a violation. Cf. *United States v. Li, 206 F.3d 56 (2000)* (en banc).

Third, the district court found that, contrary to Pineda's claim, Pineda was not deported in absentia. Pineda received a deportation hearing on July 22, 1994, at which he was warned that unless he filed an asylum application within an allotted period of time, the IJ would issue a deportation order without further hearing. Thus, the district court concluded that when the IJ issued the deportation order on March 2, 1995, the IJ simply "did what he told Pineda that he would do" and lawfully issued the final order in accordance with INS regulations. Having found no fundamental flaw in the deportation proceedings, the district court denied the motion to suppress.

On April 17, 2001, Pineda, pursuant to a plea agreement, entered a conditional plea of guilty to the charge of illegal reentry by [**5] an aggravated felon after deportation. Pursuant to *Rule 11(a)(2) of the Federal Rules of Criminal Procedure*, Pineda reserved his right to appeal the district court's denial of the motion to suppress. Following the plea colloquy, the district court found that the defendant understood the nature of the charge and that his plea was voluntary, intelligent, and knowing. On August 21, 2001, Pineda was sentenced to seventy months of imprisonment, two years of supervised relief, and a $100.00 special assessment, but he was not fined.

## II. The Guilty Plea

We review the acceptance of the guilty plea for plain error because Pineda did not seek to withdraw his plea in the district court. See *United States v. Vonn, 535 U.S. 55, 122 S. Ct. 1043, 1046, 152 L. Ed. 2d 90 (2002); United States v. Gandia-Maysonet, 227 F.3d 1, 5 (1st Cir. 2000)*. We consider the totality of the circumstances to determine whether such plain error exists and to determine whether the guilty plea is voluntary, intelligent, and knowing within the framework of Rule 11. *United States v. Hernandez–Wilson, 186 F.3d 1, 12 (1st Cir. 1999); United States v. Cotal–Crespo, 47 F.3d 1, 3 (1st Cir. 1995).* [**6]

In order to be acceptable, a guilty plea must be found to comport with the three core concerns of Rule 11:  (1)

the absence of coercion; (2) the defendant's understanding of the nature of the charges against him; and (3) the defendant's understanding of the consequences of his guilty plea. *United States v. Isom, 85 F.3d 831, 835 (1st Cir. 1996); Cotal–Crespo, 47 F.3d at 4.*

The thrust of Pineda's argument is that the Rule 11 colloquy was inadequate as evidenced by Pineda's ambivalent answers and questions to the judge. After careful consideration of the arguments [*7] presented by the parties in their briefs and at oral argument and review of the record, we find that each of the three core Rule 11 concerns have been met and affirm the district court's acceptance of the guilty plea as voluntary, intelligent, and knowing. We briefly address each of the Rule 11 concerns.

First, the district court properly found an absence of coercion because Pineda ultimately responded unequivocally that he had not been coerced, and further because Pineda's responses provided no grounds for believing his guilty plea was indeed coerced.

Second, the district court correctly [**7] found that Pineda understood the charges against him. We agree with the government that the source of any seeming confusion on Pineda's part arose from the fact that Pineda wanted to properly preserve his right to appeal the ruling on the motion to suppress because he believed his deportation proceeding violated due process. Pineda nonetheless understood the charges against him and ultimately admitted that he had committed the offense conduct described by the government. See *Cotal-Crespo, 47 F.3d at 6* (holding that when the government sets forth the elements of the offense and the defendant's conduct, a defendant's admission that the allegations are true suffices to show he understands the charges).

Finally, the district court correctly found that Pineda understood the consequences of his guilty plea. In response to Pineda's questions, the court thoroughly explained the consequences of pleading guilty. Once again, Pineda's main concern was his ability to appeal the deportation issue, which the court explained to him would be possible.

## III. The Motion to Suppress

The motion to suppress evidence of Pineda's prior deportation presents a mixed question of law [**8] and fact, and the ultimate determination of constitutionality is subject to de novo review. *Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996); United States v. Goldman, 41 F.3d 785, 787 (1st Cir. 1994)*. Any related findings of fact, however, are subject to clear error review. *United States v. Martinez–Molina, 64 F.3d 719, 726 (1st Cir. 1995).*

57 Fed. Appx. 4, *7; 2003 U.S. App. LEXIS 740, **8

Pineda argues that his prior deportation is fundamentally flawed because he was: (1) not properly notified of his right to appeal; (2) improperly deported in absentia; and (3) not notified of his right to contact the consulate of his home country of El Salvador. After careful consideration of the arguments presented and review of the record, we agree with the reasoning presented in the district court's memorandum and affirm the denial of the motion to suppress.

**Affirmed.**

LEXSEE 2006 U.S. APP. LEXIS 18972

**UNITED STATES of AMERICA, Plaintiff-Appellee, v. PEDRO GARCIA-PEREZ, Also Known As JOSE ASTORGA-TORRES, Defendant-Appellant.**

No. 03-6678

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

06a0522n.06;

*2006 U.S. App. LEXIS 18972*

**July 26, 2006, Filed**

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**COUNSEL:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Charles P. Wisdom, Jr., Asst. U.S. Attorney, James E. Arehart, Asst. U.S. Attorney, David A. Marye, Asst. U.S. Attorney, Lexington, KY.

For PEDRO GARCIA-PEREZ, aka Jose Astorga-Torres, Defendant - Appellant: Michael M. Losavio, Louisville, KY.

PEDRO GARCIA-PEREZ, aka Jose Astorga-Torres, Defendant - Appellant, Pro se, Federal Correctional Institute - Medium, Beaumont, TX.

**JUDGES:** BEFORE GUY, DAUGHTREY, and CLAY, Circuit Judges.

**OPINION:**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

BEFORE: GUY, DAUGHTREY, and CLAY, Circuit Judges.

CLAY, Circuit Judge. Defendant Pedro Garcia-Perez, also known as Jose Astorga-Torres, appeals the December 19, 2003 judgment of the United States District Court for the Eastern District of Kentucky convicting and [*2] sentencing Defendant for illegal re-entry into the United States by an alien who had previously been deported subsequent to a conviction for the commission of an aggravated felony, in violation of *8 U.S.C. §§ 1326(a)* and *1326(b)(2)*. For the following reasons, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

On September 4, 2003, a federal grand jury indicted Defendant on one count of illegal reentry by an alien who had been previously deported subsequent to a conviction for commission of an aggravated felony, in violation of *8 U.S.C. §§ 1326(a)* and *1326(b)(2)*. On September 12, 2003, Defendant pleaded not guilty to the count. On October 24, 2003, the district court rearraigned Defendant and Defendant pleaded guilty to the count. Defendant did not have a plea agreement with the prosecution, inasmuch as Defendant wished to have the right to appeal his conviction and sentence. On December 12, 2003, Defendant filed a motion to have the district court sentence Defendant below the then-mandatory range provided by the Federal Sentencing Guidelines [*3] ("Guidelines"). On December 19, 2003, the district court denied the motion. That same day, the district court sentenced Defendant to ninety-six months imprisonment, the maximum allowed by the Guidelines, and three years of supervised release. On December 29, 2003, Defendant filed a notice of appeal.

### B. FACTS

Defendant is a native and citizen of Mexico. He first came to the United States in 1976, and he eventually settled in the state of Washington. Defendant was first deported from the United States on July 9, 1992, after Defendant was convicted in state court of possession of

cocaine. Defendant subsequently returned to the United States and Washington, where, in 1993, he was convicted in state court of delivery of cocaine. After serving a prison term, Defendant was deported on May 25, 1994. Defendant again returned to the United States, this time settling in Kentucky. On October 23, 1999, Defendant was arrested by state police for criminal trespass. Defendant was subsequently identified as an alien who had been previously deported. Defendant was convicted in federal court of illegal reentry by an alien who had been previously deported subsequent to a conviction for commission [*4] of an aggravated felony. After serving his prison term, Defendant was again deported on March 6, 2002. Defendant returned to the United States and Kentucky. On December 12, 2002, Defendant was arrested for striking his girlfriend in the face with a beer can. Defendant was identified as an alien who had been previously deported subsequent to the conviction of an aggravated felony, *i.e.*, the delivery of cocaine in 1993.

## II. DISCUSSION

### A. THE VIENNA CONVENTION

#### 1. Preservation of the Issue

Defendant failed to object to the district court's plea colloquy on the ground that the district court failed to inform Defendant of his right to contact his citizen country's consulate. This will affect the standard of review in this case.

#### 2. Standard of Review

Because Defendant failed to object to the plea colloquy, this Court reviews the district court's decision for plain error. *United States v. Denkins, 367 F.3d 537, 545 (6th Cir. 2004)* (citation omitted). Plain error analysis requires four steps:

> First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end. However, if an error [*5] occurred, we then consider if the error was plain. If it is, then we proceed to inquire whether the plain error affects substantial rights. Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under *Rule 52(b)*, or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

*United States v. Thomas, 11 F.3d 620, 630 (6th Cir. 1993).*

Defendant bears the burden of demonstrating plain error. *United States v. Abboud, 438 F.3d 554, 588 (6th Cir. 2006)* (citing *United States v. Murdock, 398 F.3d 491, 496 (6th Cir. 2005)).* As the Supreme Court explained: "When an appellate court considers error that qualifies as plain, the tables are turned on demonstrating the substantiality of any effect on a defendant's rights: the defendant who sat silent at trial has the burden to show that his 'substantial rights' were affected." *United States v. Vonn, 535 U.S. 55, 62, 122 S. Ct. 1043, 152 L. Ed. 2d 90 (2002)* (citation omitted).

#### 3. Analysis

The district court did not commit plain error in [*6] failing to inform Defendant of his right to contact his citizen country's consulate under the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 ("Vienna Convention"). Under this Court's interpretation, the Vienna Convention does not create enforceable individual rights. *United States v. Emuegbunam, 268 F.3d 377, 394 (6th Cir. 2001).* Moreover, Defendant has failed to demonstrate how the failure of the district court to inform Defendant of his rights under the Vienna Convention led to an involuntary or unknowing guilty plea, so as to affect Defendant's substantial rights.

#### A. Legal Framework

A guilty plea is more than just an admission of guilt; it is a waiver of the constitutional right to a trial by judge or jury. *Brady v. United States, 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970).* As a result, a defendant must enter a guilty plea knowingly, voluntarily, and intelligently. *Id.* The district court must verify "that the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual [*7] basis for concluding that the defendant committed the crime charged." *United States v. Webb, 403 F.3d 373, 378–79 (6th Cir. 2005)* (citing *United States v. Goldberg, 862 F.2d 101, 106 (6th Cir. 1988)).*

The Vienna Convention is a mutilateral treaty that governs the consular relationships between the signatory nations. *Emuegbunam, 268 F.3d at 388.* The relevant portion of the Vienna Convention in the instant case is Article 36, which, in its entirety, states:

> Communication and contact with nationals of the sending State n1

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the

2006 U.S. App. LEXIS 18972, *7

sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. *Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;*

(b) *if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed* [*8] *to prison or to custody pending trial or is detained in any other manner.* Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;*

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiv-

ing State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this [*9] Article are intended.

Vienna Convention, art. 36 (emphasis supplied).

n1 The "sending State" is the nation of the arrested individual, whereas the "receiving State" is the arresting nation. *Emuegbunam, 268 F.3d at 388 n.3.*

In *Emuegbunam*, this Court held that the Vienna Convention did not "create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce." *268 F.3d at 394.* In that case, the defendant, a Nigerian citizen, was arrested for conspiracy to import cocaine into the United States. *Id. at 384–85.* Before trial, the defendant complained that "prosecutors had not honored his rights under the Vienna Convention." *Id. at 387.* The district court ordered the prosecution to contact the Nigerian consulate. *Id.* Both the prosecution and the defendant contacted the Nigerian consulate. *Id.* The defendant asked the Nigerian consulate for assistance in procuring [*10] two witnesses and evidence. *Id.* In response, the consulate stated that it could not secure the witnesses in time for the defendant's trial. *Id.* The defendant filed a motion to dismiss the indictment, on the ground that the denial of earlier contact with the Nigerian consulate prejudiced his defense. *Id.* The district court denied the motion. *Id.* Following a trial, the defendant was found guilty of the charge. *Id. at 385.* The defendant appealed, based in part on the claim that the district court violated the Vienna Convention.

This Court affirmed the defendant's conviction. With respect to the defendant's claim under the Vienna Convention, the Court initially noted:

As a general rule, . . . international treaties do not create rights that are privately enforceable.

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamation, so far as the injured parties choose to seek redress, which may in the end be enforced by actual war. [*11] It is obvious that with all this the judicial courts have nothing

to do and can give no redress.

*Id. at 389*. The Court then explained that even if the Vienna Convention created enforceable individual rights, the defendant could not seek the remedy of the dismissal of the indictment under the law of this circuit. *Id. at 390* (citing *United States v. Page, 232 F.3d 536, 540 (6th Cir. 2000))*.

The defendant also sought the remedy of the reversal of his conviction under the Vienna Convention. The Court found that such remedy was also inappropriate, because the Vienna Convention did not create "any judicially enforceable right of consultation between a detained foreign national and the consular representatives of his nation." *Id. at 391* (citing *United States v. Jimenez-Nava, 243 F.3d 192, 198 (5th Cir. 2001))*. The Court pointed out that the Preamble to the Vienna Convention specifically stated: "[T]he purpose of such privileges and immunities is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States." *Id. at 392* (alteration [*12] in the original) (internal quotation marks and citation omitted). The Court recognized that the Vienna Convention spoke of the detainee having certain rights; however, the Court found:

> [T]hese references are easily explainable. The contracting States are granting each other rights, and telling future detainees that they have a "right" to communicate with their consul is a means of implementing the treaty obligations *as between States*. Any other way of phrasing the promise as to what will be said to detainees would be both artificial and awkward.

*Id. at 392* (quoting *United States v. Li, 206 F.3d 56, 66 (1st Cir. 2000)* (Selya, J. & Boudin, J., concurring)) (internal quotation marks omitted). This Court "conclude[d] that the Vienna Convention does not create in a detained foreign national a right of consular access." *Id.*

The Court also noted that "the State Department has consistently taken the view that the Vienna Convention does not create individual rights." *Id.* In practice, most countries remedy violations of Article 36 with investigations, apologies, and efforts to ensure that future violations do not occur; "[a]pparently, no [*13] country remedies violations of the Vienna Convention through its criminal justice system." *Id. at 392–93* (citing *Li, 206 F.3d at 65)*.

In *Sanchez-Llamas v. Oregon,* the Supreme Court did not answer the question of whether the Vienna Convention

created enforceable individual rights. *126 S. Ct. 2669, 165 L. Ed. 2d 557, 2006 WL 1749688, at *7 (2006)*. The Supreme Court assumed without deciding that the Vienna Convention did create such rights. n2 *Id.* Thus, *Emuegbunam* remains the controlling law of this Court.

> n2 The holding of *Sanchez-Llamas* does not control the instant case. In *Sanchez-Llamas,* the Supreme Court held that, assuming the Vienna Convention created enforceable individual rights, suppression of evidence via the exclusionary rule was not an appropriate remedy for violation of the Vienna Convention. *126 S. Ct. 2669, 165 L. Ed. 2d 557, [WL] at *11*. The Supreme Court's analysis was crafted specifically for the remedy of suppression of evidence via the exclusionary rule, and not for any other form of remedy. *See 126 S. Ct. 2669, 165 L. Ed. 2d 557, [WL] at *9–11*. The Supreme Court also held that a claim under the Vienna Convention was subject to state procedural default rules. *126 S. Ct. 2669, 165 L. Ed. 2d 557, [WL] at *17*. The instant case does not involve the suppression of evidence; instead Defendant claims his guilty plea was not knowing, voluntary, or intelligent. Additionally, the instant case does not involve state procedural default.

[*14]

**b. Application to This Case**

**i. Plain Error**

The first two steps in the plain error analysis address whether the district court committed error, and whether that error was plain. In our view, the district court did not commit plain error by failing to inform Defendant of his "right" under the Vienna Convention to contact the Mexican consulate. As explained, *supra, Emuegbunam* stands for the proposition that a foreign detainee does not have an enforceable individual right to consular access under the Vienna Convention. Defendant may not fault the district court for failing to inform him of a right that he does not have.

Defendant relies heavily on this Court's decision in *Deitz v. Money, 391 F.3d 804 (6th Cir. 2004),* for the proposition that the Vienna Convention creates enforceable individual rights. In that case, this Court remanded to the district court the issue of whether the petitioner's counsel was ineffective for failing to raise a claim based on the authorities failure to notify the Mexican consulate as required under the Vienna Convention. *Id. at 811*. Defendant argues that an implication of this decision is that the Vienna [*15] Convention creates enforceable individual rights, such that the district court in *Deitz,* on re-

mand, could have found ineffective assistance of counsel based on counsel's failure to raise this claim. Assuming *arguendo* Defendant's interpretation of *Deitz* is correct, Defendant's argument falls short, however, because:

> It is the well-settled law of this Circuit that a panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.

*LRL Props. v. Portage Metro. Hous. Auth., 55 F.3d 1097, 1105 n.2 (6th Cir. 1995).* Thus, to the extent *Deitz* conflicts with *Emuegbunam, Emuegbunam* controls, as that decision preceded *Deitz.*

Defendant's reliance on *Medellin v. Dretke, 544 U.S. 660, 125 S. Ct. 2088, 161 L. Ed. 2d 982 (2005),* is likewise misplaced. The Supreme Court in that case dismissed a writ of certiorari as improvidently granted. *Id. at 2089.* Defendant relies on language supplied by the dissent to that decision to support [*16] his position that the Vienna Convention creates enforceable individual rights; however, that language is not binding on this Court, while *Emuegbunam* is controlling authority. In sum, the district court did not commit plain error by failing to inform Defendant of his right to consular access under the Vienna Convention, because Defendant has no such right.

**ii. Substantial Rights**

Even assuming Defendant has demonstrated plain error, Defendant has failed to demonstrate an effect on his substantial rights. Under this prong of the plain error inquiry, the defendant normally must demonstrate that he was prejudiced in some way by the district court's plain error, in the sense that the error "affected the outcome of the district court proceedings." *United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).* In the instant case, Defendant argues that the district court's plain error resulted in a guilty plea that was not knowing, voluntary, and intelligent. This argument lacks merit. As explained, *supra,* a guilty plea is a waiver of the constitutional right to a trial by a judge or jury; an invalid guilty plea would thus affect the substantial rights of Defendant. Defendant's [*17] argument must fail, however, because he never demonstrates the logical connection between the district court's failure to inform Defendant of his right to contact the Mexican consulate and the purported invalidity of the guilty plea. Defendant never explains what information the Mexican

consulate could have supplied n3 that was not supplied by Defendant's counsel or the district court, such that the lack of access to that information rendered his guilty plea unknowing, involuntary, or unintelligent. *See United States v. Ademaj, 170 F.3d 58, 67 (1st Cir. 1999)* (rejecting the defendant's claim under the Vienna Convention on the ground that the defendant failed to demonstrate how contact with his citizen country's consulate would have assisted in his defense). In fact, Defendant fails to allege *any* misunderstanding of *any* provision of his guilty plea, let alone a misunderstanding that could have been alleviated by contacting the Mexican consulate. In his brief, Defendant does not spare a single word as to how he misunderstood his guilty plea, or how a misunderstanding of the guilty plea rendered said plea unknowing, involuntary, or unintelligent.

> n3 We will assume that had the district court informed Defendant of his right to contact the Mexican consulate, Defendant would have in fact contacted the Mexican consulate.

[*18]

Instead of demonstrating any lack of understanding as to his guilty plea, Defendant makes the general argument that the Vienna Convention "assures the pressures inherent in being incarcerated in a foreign country and appearing in judicial proceedings in a foreign tongue are mitigated such that the knowing and voluntary plea can be taken with assurance by the trial court." (Def. Br. 12.) We agree that being incarcerated in the United States may generally create anxiety and pressure for a foreign citizen greater than that created for a United States citizen; however, Defendant has extensive experience with the American criminal justice system. Defendant first came to this country in 1976, and, besides the three previous deportations, Defendant has resided in the United States since that time. According to his presentence report, Defendant has been arrested and convicted thirty-seven times in the United States. Defendant consequently has been imprisoned numerous times. To say that Defendant's incarceration for the charge in the instant case created pressures unique to Defendant's status as a Mexican citizen strains logic; Defendant has resided primarily within the United States for the [*19] past twenty years and is well-acquainted with incarceration in this country.

Moreover, even assuming that Defendant was subjected to additional pressure through his incarceration due solely to his status as a Mexican citizen, Defendant fails to demonstrate how contacting the Mexican consulate would have addressed this additional pressure, such that his guilty plea sans contact with the consulate was unknowing, involuntary, or unintelligent. The Tenth Circuit

rejected a similar argument in *United States v. Cazares, 60 Fed. App'x 223 (10th Cir. 2003)* (unpublished decision). In that case, the defendant was a Mexican national who had resided in the United States for twenty years. *Id. at 225*. The defendant pled guilty to a narcotics offense, but later challenged the guilty plea as involuntary due to the district court's failure to inform him of his rights under the Vienna Convention. *Id.* The Tenth Circuit disagreed:

> [The defendant] argues that because he is a foreign national, he lacks an understanding of the criminal justice system in the United States. [The defendant] further argues that his lack of understanding would be remedied by [*20] the assistance of the Mexican consulate. This court, therefore, will construe [the defendant's] arguments as a challenge to the plea on the grounds it was not knowingly and voluntarily entered. Although [the defendant] alleges a lack of understanding of the criminal justice system in the United States, [the defendant] fails to allege the particular aspects of his plea that were entered into unknowingly. After reviewing the record, this court concludes that there is nothing in the record indicating [the defendant's] plea was not knowing and voluntary.

*Id. at 227*. Likewise, Defendant fails to point to what exactly he misunderstood with respect to his guilty plea, where such misunderstanding would not have occurred had he spoken with the Mexican consulate. The point is simple: Defendant does not allege any shortcoming of the district court or his counsel with respect to Defendant's understanding of his guilty plea that could have been remedied by contacting the Mexican consulate.

Moreover, not only does Defendant not allege any shortcomings with respect to the district court and his counsel in ensuring Defendant understood his guilty plea, the record [*21] affirmatively proves that Defendant in fact understood his guilty plea. As the government notes, the record demonstrates that the district court complied with the requirements of *Federal Rule of Criminal Procedure 11*. As stated, *supra*, the district court must verify "that the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged." *Webb, 403 F.3d at 378-79*. Defendant understood his constitutional right to a trial and the rights attendant to that right; Defendant understood the charge being made against him; Defendant understood the potential punishment that

could arise from the guilty plea; and Defendant understood the factual basis of the government's case against him. Indeed, Defendant admitted the factual basis of the government's case. The record amply demonstrates that Defendant knew the nature of the guilty plea, that he voluntarily pled guilty, and that his decision was intelligent. In short, Defendant has failed [*22] to demonstrate how the district court's failure to inform him of his right to contact the Mexican consulate caused Defendant's guilty plea to be unknowing, involuntary, or unintelligent so as to affect his substantial rights.

This case is therefore similar to *Breard v. Greene, 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998)*. In that case, the Supreme Court found that, assuming the Vienna Convention created enforceable individual rights, the defendant still failed to demonstrate prejudice:

> Even were [the defendant's] Vienna Convention claim properly raised and proved, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial. . . . In this action, no such showing could even arguably be made. [The defendant] decided not to plead guilty and to testify at his own trial contrary to the advice of his own attorneys, who were likely far better able to explain the United States legal system to him than any consular official would have been. [The defendant's] asserted prejudice–that had the Vienna Convention been followed, he would have accepted the State's offer to forego [*23] the death penalty in return for a plea of guilty–is far more speculative than the claims of prejudice courts routinely reject in those cases w[h]ere an inmate alleges that his plea of guilty was infected by attorney error.

*Id. at 377* (internal citations omitted).

Likewise, in the instant case, Defendant was represented by counsel who most likely knew more about the United States legal system than any Mexican consular official. Moreover, the district court explained Defendant's legal rights and the legal consequences of his actions in pleading guilty. In order to prove prejudice, Defendant must demonstrate that had he contacted the Mexican consulate, his decision to plead guilty would have been affected, such that his guilty plea was not knowing, voluntary, or intelligent. This result is not only speculative but it is also unlikely. Defendant admitted that he was

guilty of the crime for which he was charged. When asked if the government would be able to prove its case, Defendant replied, "Yes, of course. Why not, it's true." (J.A. at 48.) Defendant knew that the case against him was strong; there simply is no reason to believe that Defendant would not have [*24] pled guilty had he spoken to the Mexican consulate. By pleading guilty, Defendant was able to decrease his base offense level for acceptance of responsibility; by not pleading guilty and going to trial, Defendant would have foregone the decrease in his base offense level and faced a near-certain conviction, as both he and his counsel acknowledged. It bears repeating that Defendant does not allege that the Mexican consulate had information otherwise unavailable to Defendant, and that had Defendant been privy to such information, Defendant would not have pled guilty, despite the higher sentence he faced if he went to trial. Even assuming the district court committed plain error, Defendant has failed to demonstrate that his substantial rights have been affected.

## B. THE COURT INTERPRETERS ACT

### 1. Preservation of the Issue

Defendant did not object to the interpreter he received before the district court. This will affect the standard of review.

### 2. Standard of Review

Because Defendant did not object to the interpreter he received before the district court, this Court reviews the appointment of the interpreter for plain error. *United States v. Camejo, 333 F.3d 669, 672 (6th Cir. 2003)* [*25] (citation omitted); *see also United States v. Gonzales, 339 F.3d 725, 728 (8th Cir. 2003)*. Plain error analysis requires four steps, as described in the preceding section. *See Thomas, 11 F.3d at 630.*

Defendant bears the burden of demonstrating plain error. *Abboud, 438 F.3d at 588* (citation omitted). As the Supreme Court explained: "When an appellate court considers error that qualifies as plain, the tables are turned on demonstrating the substantiality of any effect on a defendant's rights: the defendant who sat silent at trial has the burden to show that his 'substantial rights' were affected." *Vonn, 535 U.S. at 62* (citation omitted).

### 3. Analysis

The district court did not commit plain error in their appointment of an interpreter to Defendant. Defendant has failed to demonstrate that the appointed interpreter was in fact a non-certified interpreter. Defendant also has failed to demonstrate any inadequacy of the appointed interpreter's performance such that his guilty plea was unknowing, involuntary, or unintelligent.

### a. Legal Framework

A guilty plea is more than just an admission of guilt; it is a [*26] waiver of the constitutional right to a trial by judge or jury. *Brady, 397 U.S. at 748.* As a result, a defendant must enter a guilty plea knowingly, voluntarily, and intelligently. *Id.* The district court must verify "that the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged." *Webb, 403 F.3d at 378-79* (citation omitted).

The district court must be especially careful in accepting a guilty plea from a defendant who does not have a firm command of the English language. As the Fifth Circuit recognized:

> The likelihood of imprisonment following a guilty-plea conviction "demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama, 395 U.S. 238, 243-44, 89 S. Ct. 1709, 23 L. Ed. 2d 274 . . . (1969).* The record on appeal must reflect that a defendant was apprised fully of his constitutional rights, and specially [*27] instructed on the rights and privileges which he waived by entering the guilty plea. *Fed. R. Crim. P.11(c), (d). An adequate understanding of the English language is a threshold requirement for a voluntary plea.*

*United States v. Perez, 918 F.2d 488, 490 (5th Cir. 1990)* (emphasis supplied).

In order to insure that defendants who are not sufficiently competent in the English language understand the judicial proceedings against them, Congress enacted the Court Interpreters Act ("Act"), *28 U.S.C. § 1827 (2006).* The Act states, in relevant part:

> The presiding judicial officer, with the assistance of the Director of the Administrative Office of the United States Courts, *shall* utilize the services of the most available certified interpreter, or when no certified interpreter is reasonably available, as determined by the presiding judicial officer, the services of an otherwise qualified interpreter, in judicial proceedings instituted by the United

States, if the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant [*28] in a criminal case), or a witness who may present testimony in such judicial proceedings—

(A) speaks only or primarily a language other than the English language; or

(B) suffers from a hearing impairment (whether or not suffering also from a speech impairment)

so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.

28 U.S.C. § 1827(d)(1) (emphasis supplied).

### b. Application to This Case

#### i. Plain Error

The first two steps in the plain error analysis address whether the district court committed error, and whether that error was plain. The district court has wide discretion in determining whether an interpreter is appropriate in a given case. *United States v. Markarian, 967 F.2d 1098, 1104 (6th Cir. 1992)* (citation omitted). That said, when the district court exercises its discretion and determines an interpreter is appropriate, the district court must follow the strictures of the Act. As the Eighth Circuit noted:

The language of [*29] the Court Interpreters Act is clear: once a district court decides to use an interpreter, it is obligated to use a certified interpreter, unless a certified interpreter is not reasonably available, in which case another qualified interpreter is to be appointed. ... The certification requirement of the Act was intended to provide a procedural safeguard for non-native English speaking defendants during legal proceedings.

*Gonzales, 339 F.3d at 728* (internal citations omitted). In *Gonzales,* the Eighth Circuit found that the district court's use of a non-certified interpreter was error, and that the error was plain, under the first two steps of plain error analysis. *Id.* We agree with that analysis; however, in this case, it is unclear from the record whether the interpreter

utilized in Defendant's case was in fact a non-certified interpreter. As stated, *supra,* Defendant has the burden to demonstrate plain error. Defendant has not carried this burden, as Defendant has failed to present any evidence that the interpreter in his case was indeed a non-certified interpreter.

#### ii. Substantial Rights

Even assuming that the district court appointed a non-certified [*30] interpreter, Defendant has failed to demonstrate an effect on his substantial rights. Defendant claims that the lack of a certified interpreter rendered his guilty plea unknowing, involuntary, or unintelligent. As stated, *supra,* a guilty plea is a waiver of the constitutional right to a trial; as a result, an invalid guilty plea would affect the substantial rights of Defendant. Defendant, however, fails to demonstrate how the appointment of the non-certified interpreter caused his guilty plea to be invalid.

From the outset, we note that Defendant does not allege *any* inadequacies as to the performance of the non-certified interpreter. Defendant does not point to any misunderstandings that he had about the guilty plea that resulted from the use of a non-certified interpreter, misunderstandings that would not have occurred had the district court appointed a certified interpreter. Thus, there is no nexus between the district court's plain error and Defendant's argument that the guilty plea was unknowing, involuntary, or unintelligent. We reiterate that Defendant bears the burden on plain error review in demonstrating that his substantial rights have been affected. Defendant has [*31] not met this burden; there is simply no evidence in the record that the use of a non-certified interpreter negatively affected Defendant's understanding of the guilty plea, such that the guilty plea was unknowing, involuntary, or unintelligent. As the Eighth Circuit viewed a factually-similar circumstance:

[T]here is no indication in the record that the interpreters and [the defendant] had communication problems, or that any confusion on [the defendant's] part stemmed from any translation error; the plea hearing transcript supports that [the defendant] ultimately understood his . . . plea and desired the benefits it yielded; and counsel offers no other evidence that the plea was not knowing, voluntary, and intelligent.

*United States v. Aispuro-Guadiana, 97 Fed. App'x 76, 77 (8th Cir. 2004)* (unpublished decision).

Defendant seems to advocate a *per se* rule: if the district court fails to appoint a certified interpreter, a de-

fendant's guilty plea cannot be knowing, voluntary, and intelligent: "The failure of the record to show that a certified interpreter was used makes it impossible for the trial court [to] assure [Defendant's] guilty [*32] plea was properly taken . . . ." (Def. Br. 22.) We disagree with this proposed rule. "The purposes of the Act are to ensure that a party has comprehension of the proceedings and to provide the means to communicate effectively with counsel." *United States v. Sanchez, 928 F.2d 1450, 1455 (6th Cir. 1991)* (citation omitted). "[T]he ultimate question is whether the translator's performance has rendered the trial fundamentally unfair . . . ." *United States v. Huang, 960 F.2d 1128, 1136 (2d Cir. 1992)* (citations omitted). Defendant's per se rule is therefore not well-taken; this Court must determine whether the use of a non-certified interpreter so subverted the purposes of the Act such that the proceedings against Defendant were fundamentally unfair. Defendant has not raised a single iota of evidence demonstrating that the use of a non-certified interpreter, as opposed to a certified interpreter, affected his guilty plea such that the proceedings against him were fundamentally unfair. In short, Defendant has failed to demonstrate that the use of a non-certified interpreter caused his guilty plea to be unknowing, involuntary, or unintelligent.

[*33] **C. CUMULATIVE ERROR**

For the reasons set forth in the preceding sections, Defendant's claim of cumulative error also fails. Defendant asserts that the cumulative impact of the district court's plain errors demonstrates that his guilty plea was unknowing, involuntary, or unintelligent. We disagree. Defendant has failed to demonstrate that the district court committed error, let alone plain error, for his claims under the Vienna Convention and the Court Interpreters Act. *See supra.* Moreover, even assuming plain error under both of these claims, Defendant has provided no evidence that the district court's plain errors affected the validity of his guilty plea. *See supra.* Since Defendant has failed to provide evidence of an effect to his substantial rights under either claim, there is no evidence to cumulate to determine whether, under the totality of the circumstances, Defendant's plea was invalid.

**D. RESENTENCING**

**1. Preservation of the Issue**

Defendant did not object to his sentence on the ground that judge-found fact increased his maximum sentence. n4 This will affect the standard of review.

> n4 The only objection that Defendant made to his sentence was that he believed that the Guidelines violated the *Double Jeopardy Clause of the U.S.*

*Constitution*, as the Guidelines "double-counted" because it increased Defendant's base offense level for a crime for which Defendant had already served a term of imprisonment, and the Guidelines also increased Defendant's sentencing range based on Defendant's criminal history. Defendant does not pursue this argument on appeal.

[*34]

**2. Standard of Review**

Because Defendant failed to object to his sentence on the ground that judge-found fact increased his maximum sentence, this Court reviews Defendant's sentence for plain error. *United States v. Barnett, 398 F.3d 516, 525 (6th Cir. 2005)*. This Court engages in a four-step plain error inquiry: (1) whether there was error; (2) whether that error was plain; (3) whether that plain error affected substantial rights; and (4) whether that plain error seriously affects the fundamental fairness, integrity, or public reputation of judicial proceedings. *Id.* (citing *Johnson v. United States, 520 U.S. 461, 466, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997))*.

**3. Analysis**

The district court did not commit plain error in its sentencing of Defendant. While the district court treated the Guidelines as mandatory, the record demonstrates that the district court would not have given Defendant a lesser sentence had it treated the Guidelines as advisory.

**a. Legal Framework**

In *United States v. Booker,* the Supreme Court held that the mandatory scheme under the Guidelines was unconstitutional, as it violated the *Sixth Amendment. 543 U.S. 220, 244, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)*. [*35] The Court reaffirmed the holding in *Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)*: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker, 543 U.S. at 244*.

In order to correct the Guidelines' unconstitutional nature, the Court severed the portion of the federal sentencing statute that called for mandatory application of the Guidelines. *Id. at 245–46*. Thus, the Guidelines stand on constitutionally firm grounds as advisory rules. *Id.*

**b. Application to This Case**

By treating the Guidelines as mandatory when sentencing Defendant, the district court committed error, and

that error was plain. *Barnett, 398 F.3d at 525–26.* This Court presumes that the plain error affected Defendant's substantial rights, *see id. at 527–28,* and, if this presumption holds, this Court will also find that such plain error seriously affects the fundamental fairness, integrity, or public reputation of judicial [*36] proceedings, so as to warrant this Court's discretion in granting relief, *see id. at 530.*

The presumption that the plain error of the district court affected Defendant's substantial rights is rebuttable. "[W]here the trial record contains clear and specific evidence that the district court would not have, in any event, sentenced the defendant to a lower sentence under an advisory Guidelines regime," the presumption that the district court's plain error affected Defendant's substantial rights is destroyed. *Id. at 529.* The record in the instant case contains clear and specific evidence that the district court would not have sentenced Defendant to a lower sentence had it treated the Guidelines as advisory. First, at the sentencing hearing, the district court stated, "The motion to sentence below the Guidelines will be denied. The calculations are correct, they're appropriate, and they conform to the law as it now exists, and so–*as a matter of fact, I was thinking about sentencing above the guidelines.*" (J.A. at 54) (emphasis supplied). Second, the district court commented that "this is the defendant's fourth illegal re–entry into the country and [*37] his second federal conviction for this. His criminal history includes violence, a deadly weapon, weapons, drugs, he is an alcoholic and is a dan-

ger to the community." (J.A. at 55.) Finally, the district court sentenced Defendant to the maximum sentence then allowable under the Guidelines, ninety-six months.

These facts are clear and specific evidence that the district court would not have given Defendant a lower sentence under an advisory Guidelines scheme. Indeed, we are somewhat puzzled by Defendant's insistence that his case be remanded for resentencing, as it seems clear that the district court will in all likelihood impose a higher sentence. This case is factually analogous to this Court's decision in *Webb,* where the district court considered an upward departure from the Guidelines, found that the defendant was a "menace" who the community did not want to "have around," and sentenced the defendant to the maximum time allowed under the Guidelines. *403 F.3d at 382.* Under such facts, this Court "conclude[d]" that this is an exceptional case where the record contains clear and specific evidence that the district court would not have sentenced [the defendant] to [*38] a lower sentence under an advisory Guidelines regime." *Id. at 382–83.* Like *Webb,* the instant case presents a situation where "the district court would have imposed the same sentence, if not a lengthier one, had the district court known that it was not bound by the Guidelines." *Id. at 383.* We therefore will not remand this case for resentencing.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

LEXSEE 120 FED. APPX. 895

**BARRY GETCHEY, Appellant v. COUNTY OF NORTHUMBERLAND**

**No. 04–1693**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*120 Fed. Appx. 895; 2005 U.S. App. LEXIS 190*

**December 17, 2004, Submitted Under Third Circuit LAR 34.1(a)**
**January 6, 2005, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civil No. 03–CV–0826). District Judge: The Honorable James F. McClure.

**DISPOSITION:** Affirmed.

**COUNSEL:** For BARRY GETCHEY, Appellant: Steven Kachmar, Pottsville, PA.

For COUNTY OF NORTHUMBERLAND, Appellee: Robert G. Hanna, Jr., James D. Young, Lavery, Faherty, Young & Patterson, Harrisburg, PA.

**JUDGES:** Before: NYGAARD and GARTH, Circuit Judges. and POLLAK, * District Judge.

> * Honorable Louis H. Pollak, Senior District Judge for the United States District Court of the Eastern District of Pennsylvania, sitting by designation .

**OPINION BY:** POLLAK

**OPINION:**

[*896] OPINION OF THE COURT

POLLAK, District Judge.

In this case, we are asked to review dismissal of a complaint filed by Barry Getchey against the County of Northumberland. Judge James F. McClure of the United States District Court for the Middle District of Pennsylvania dismissed Getchey's complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* [**2] on the ground that the statute of limitations had run on the injuries alleged therein. This court exercises plenary review over a district court's grant of a motion to dismiss, see, e.g., *City of Pittsburgh v. West Penn Power Company, 147 F.3d 256, 262 n.12 (3d Cir. 1998)*. For purposes of such review, all allegations contained in the complaint are accepted as true, see, e.g., *Morganroth & Morganroth v. Norris, McLaughlin, & Marcus, P.C., 331 F.3d 406, 408 (3d Cir.* [*897] *2003)*. For the reasons expressed below, we affirm the ruling of the District Court.

II.

Getchey maintains that, on January 20, 1956, when he was twelve years old, he was convicted of truancy from school by Alderman B. Lee Morgan of the Court of Common Pleas of Northumberland County, Pennsylvania. Getchey was sentenced for a period of ten days, beginning on January 20, 1956, to the Northumberland County Prison, an adult correctional facility. At that time, the Northumberland County Prison did not have facilities for juveniles. Getchey was thus placed among the adult inmates.

During his incarceration, Getchey, so he alleges, was sexually assaulted by two other inmates on at least [**3] five separate occasions. These inmates allegedly told Getchey that, if he reported the incidents, he would be harmed and "sent to the 'dungeon'" (Complaint P 20). Despite these threats, Getchey reported the attacks to Paul Dungar, warden of the prison at the time. Warden Dungar allegedly told Getchey to say nothing in order to avoid taunting from other children and embarrassment to his mother (Id. at P 21). Without further recourse, Getchey repressed memories of the assaults, apparently until very recently (Appellant's Br. at 7).

Upon emergence of these memories, Getchey filed a complaint against the County of Northumberland, alleging three counts – negligence for failing to prevent adult inmates from assaulting plaintiff (Count I); vicarious liability for the actions undertaken by the County's agents,

servants, and employees, including Alderman Morgan and Warden Dungar, who allegedly acted within the scope of their employment and directly and proximately caused plaintiff's injuries (Count II); and punitive damages for the county's allegedly malicious, deliberate, intentional, willful and wanton conduct toward plaintiff (Count III). The District Court construed Getchey's complaint [**4] as being brought under *42 U.S.C. §§ 1983* and *1985(3)*.

The County moved to dismiss Getchey's complaint for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. Specifically, the County argued that Getchey's claims were time-barred. The District Court agreed, finding that the statute of limitations for § 1983 and § 1985(3) claims, which it appropriately borrowed from Pennsylvania state law, is two years, and so had long since expired. Judge McClure further found that Getchey's repression of the memories of the assault did not provide grounds to toll the statute of limitations. Judge McClure approvingly cited *Dalrymple v. Brown, 549 Pa. 217, 701 A.2d 164 (Pa. 1997)*, a Pennsylvania Supreme Court case holding that repressed memory syndrome does not constitute an appropriate ground upon which to toll the statute of limitations. In response to Getchey's argument that equity mandated tolling due to the County's fraudulent concealment, Judge McClure found that no concealment had occurred. While Getchey may have been dissuaded from reporting his assaults, [**5] Judge McClure observed, Warden Dungar did not deny their occurrence – a prerequisite for fraudulent concealment, see *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994)*. Judge McClure concluded that dismissal of the complaint was warranted. This timely appeal followed.

III.

Because neither *42 U.S.C. § 1983* nor *§ 1985(3)* contains a statute of limitations, "federal courts must look to the [*898] statute of limitations governing analogous state causes of action," *Urrutia v. Harrisburg County Police Department, 91 F.3d 451, 457 n. 9 (3d Cir. 1996)*; see also *Sameric Corp. of Delaware v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998)*.

In determining which state limitations period to use in federal civil rights cases, we look to the general, residual statute of limitations for personal injury actions. See *Wilson v. Garcia, 471 U.S. 261, 276–80, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985)*. We must also incorporate any relevant state tolling rules. See *Hardin v. Straub, 490 U.S. 536, 543–44, 104 L. Ed. 2d 582, 109 S. Ct. 1998 (1989)*. Thus, for § 1983 [**6] and § 1985 actions originating

in Pennsylvania, we look to *42 Pa. C.S. §§ 5524*.

*Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000)* (applying the Pennsylvania two-year statute of limitations to a claim alleging violation of plaintiff's federal civil rights as a result of her forced sterilization, performed pursuant to a policy of sterilizing the mentally retarded). *Section 5524* provides a two-year statute of limitations to personal injury claims like Getchey's. n1

> n1 Appellant and appellee cite *42 Pa. C.S.A. § 5533* in addition to *§ 5524*. Section 5533 provides that, "if an individual entitled to bring a civil action arising from childhood sexual abuse is under 18 years of age at the time the cause of action accrues, the individual shall have a period of 12 years after attaining 18 years of age in which to commence an action for damages...." This section is inapplicable for two reasons. First, as appellees note, this tolling provision did not become effective until 1984; it "cannot revive a cause of action which accrued and expired [twenty-eight years] prior its effective date," when Getchey's injuries occurred. *Dalrymple v. Brown, 549 Pa. 217, 701 A.2d 164, 166 n.3 (Pa. 1997)*. Second, even if the minority provision were in effect at the time of Getchey's assaults, it would still fail to excuse his delay since his thirtieth birthday – the deadline that *section 5533* stipulates – has long since passed.

[**7]

Notwithstanding the more than four decades lapse of time since Getchey's injuries, he argues that the statute of limitations should be tolled under either Pennsylvania's discovery rule or the federal doctrine of equitable tolling.

a. *The Discovery Rule*

"The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible." *Murphy v. Diogenes Saavedra, M.D., P.C., 560 Pa. 423, 746 A.2d 92, 94 (Pa. 2000)*. Whether the discovery rule applies in cases of repressed memory is a question of state law. See *Federal Home Loan Mortgage v. Scottsdale Insurance Co., 316 F.3d 431, 443 (3d Cir. 2003)* ("[Federal courts] are not free to impose [their] own view of what state law should be; [they] are to apply state law as interpreted by the state's highest court."); *National Surety Corp. v. Midland Bank, 551 F.2d 21 (3d Cir. 1977)* ("State law as announced by the highest court of the State

120 Fed. Appx. 895, *898; 2005 U.S. App. LEXIS 190, **7

is to be followed. This [**8] is not a diversity case but the same principle may be applied for the same reasons, *viz.*, the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law.").

In *Dalrymple v. Brown, 549 Pa. 217, 701 A.2d 164, 166 n.3 (Pa. 1997)*, the Pennsylvania Supreme Court considered whether the discovery rule ought to toll the statute of limitations where repressed memory syndrome prevented the victim of sexual abuse from discovering her injuries until some thirty years after they had occurred. [*899] The court declined to extend the discovery rule to cases of repressed memory, stating that "the very essence of the discovery rule in Pennsylvania is that it applies only to those situations where the nature of the injury itself is such that no amount of vigilance will enable the plaintiff to detect an injury," and finding that battery is not such an injury since "in a typical battery, all the elements of the offensive touching will be present and ascertainable by the plaintiff at the time of the touching itself." *Id. at 170*. The court defended its decision on policy grounds, arguing that a reasonable person approach [**9] to the discovery rule "allows for equity in protecting those parties who could not, through the exercise of reasonable diligence, know they were injured and simultaneously protects the tortfeasor from being faced with stale claims that, due to the passage of time and the fading of memory, may be indefensible." *Id. at 170*

The *Dalrymple* decision is dispositive here. n2 See *Federal Home Loan Mortgage, 316 F.3d at 443*. While Getchey may have repressed memories of the assaults, the Dalrymple reasoning precludes us from using the repression as an excuse since it is not the case that "no amount of vigilance" would have enabled Getchey to uncover the injuries. *701 A.2d at 170*. After all, Getchey was surely aware of these as they were occurring. See id. Indeed, we know that this awareness must have persisted at least in the short term, for Getchey obviously possessed knowledge of the attacks at the time that he reported them to Warden Dungar. Since what matters in Pennsylvania for the purpose of applying the discovery rule is whether a reasonable person could have discovered the injury within the statute of limitations, and not whether the plaintiff [**10] in fact did so, and since Getchey could have, and indeed did, discover his injuries within that time, the discovery rule ought not to apply to him.

n2 As such, the precedents Getchey cites from

jurisdictions where the discovery rule has been extended to cases of repressed memory are irrelevant; Getchey's invitation to this court to join these other jurisdictions is thus one that we are not in a position to accept.

b. *Equitable Tolling*

Equitable tolling is appropriate in three situations:

(1) where a defendant actively misleads a plaintiff with respect to her cause of action; (2) where the plaintiff has been prevented from asserting her claim as a result of other extraordinary circumstances; or (3) where the plaintiff asserts her claims in a timely manner but has done so in the wrong forum.

*Lake, 232 F.3d at 370 n.9*. Getchey argues that his case is like the first situation in which equity mandates tolling the statute of limitations.

More specifically, Getchey argues that [**11] Warden Dungar misled Getchey by telling him that he would humiliate himself and his mother were he to report the attacks to anyone else. Yet, however unresponsive Warden Dungar may have been, he did not mislead Getchey with respect to the availability of a cause of action because Warden Dungar never denied that the injuries occurred. Since the first situation under which equitable tolling is appropriate requires the plaintiff to have been misled about the availability of a cause of action, the first situation does not extend to Warden Dungar's conduct. Thus, Getchey's argument that equitable tolling is appropriate here is not persuasive.

IV.

Neither the discovery rule nor the federal doctrine of equitable tolling provides grounds for tolling the statute of limitations [*900] in this case. As such, Getchey's case is time-barred and the decision of the District Court is AFFIRMED. n3

n3 Because we reach this decision on statute of limitations ground, we need not consider appellee's argument that Getchey has failed to state a cognizable federal civil rights claim.

[**12]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **RICARDO A. DE LOS SANTOS MORA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. No. 06-46 JFF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DOVER, DELAWARE POLICE** | ) | |
| **DEPARTMENT, ATTORNEY** | ) | |
| **GENERAL MARY JANE BRADY, AND** | ) | |
| **DOVER CHIEF OF POLICE JEFFREY** | ) | |
| **HOBARTH (Horvath),** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Griffith, Esquire hereby certify that on this 20th day of September, 2006, two

(2) true and correct copies of **Defendants', City of Dover Police Department and Dover Chief

of Police Jeffrey Horvath, Motion to Dismiss in Lieu of an Answer,** were forwarded to the

below named addressees by first-class mail in addition to being served electronically via

CourtLink:


Ricardo A. De Los Santos Mora
27615083
United States Penitentiary
P.O. Box 150160
Atlanta, GA 30315
US
Pro Se

Linda M. Carmichael, Esquire
Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
Attorney for Defendant
M. Jane Brady, Esquire

**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**


*/s/Daniel A. Griffith* DE ID *4209*

BY:_____

DANIEL A. GRIFFITH, ESQUIRE (No. 4209)
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899-8888
(302) 552-4317
Email: dagriffith@mdwcg.com
Attorney for Defendants, City of Dover
Police Department and Dover Chief of
Police Jeffrey Horvath


\15_A\LIAB\DAGRIFFITH\SLPG\378468\HXRUSSO\06151\00107